743 So.2d 556 (1999)
CSX TRANSPORTATION, INC., a foreign corporation, Appellant,
v.
Angelica Rose PALANK, as Personal Representative of the Estate of Paul Joseph Palank, deceased; and surviving spouse of Paul Joseph Palank, deceased; and as mother, natural guardian and next friend of Taylor Rose Palank, a minor, and Josef Paul Palank, a minor, Appellees.
Nos. 97-3798, 98-3875.
District Court of Appeal of Florida, Fourth District.
August 25, 1999.
Rehearing Denied November 5, 1999.
*558 John R. Hargrove of Heinrich Gordon Hargrove Weihe & James, P.A., Fort Lauderdale, and William G. Ballaine of Landman Corsi Ballaine & Ford P.C., New York, NY, for appellant.
Edna L. Caruso and Russell S. Bohn of Caruso, Burlington, Bohn & Compiani, P.A. and Searcy, Denney, Scarola, Barnhart & Shipley, P.A., West Palm Beach, for appellees.
DELL, J.
This action arises out of the derailment of an Amtrak train which was traveling on CSX Transportation, Inc.'s ("CSX") tracks in Lugoff, South Carolina, on July 31, 1991. The decedent, Paul Palank, was a passenger aboard the train. He was the husband of Angelica Palank and the father of two minor children, Josef and Taylor Palank. Angelica Palank, as personal representative of the estate, sued CSX for the wrongful death of Paul Palank, seeking compensatory and punitive damages. CSX did not contest liability on Palank's compensatory damage claims, and this court affirmed the jury's award of $6.14 million in compensatory damages. See CSX Transport., Inc. v. Palank, 697 So.2d 858 (Fla. 4th DCA 1997).
During the punitive damage phase of the trial, the jury determined that CSX was both directly and vicariously liable for the derailment, and awarded Palank $50 million. CSX moved for entry of judgment in accordance with its motion for a directed verdict and alternatively moved for a new trial or remittitur. The trial court denied CSX's motion for a directed verdict, new trial and remittitur, and granted Palank's motion for entry of the $50 million judgment. The trial court also entered a Final Cost Judgment for $294,487.59 in favor of Palank as the prevailing party. CSX appeals the punitive damage award on grounds that the trial court should have granted a directed verdict in favor of CSX, erred in denying CSX's motion for a new trial and erred in denying a remittitur. CSX also appeals the award of costs. We affirm.
CSX argues that the trial court erred in failing to grant a directed verdict in its favor because appellee did not prove that CSX's conduct was the equivalent of criminal manslaughter, as stated in Jeep Corp. v. Walker, 528 So.2d 1203 (Fla. 4th DCA 1988).
In White Construction Co. v. Dupont, 455 So.2d 1026 (Fla.1984), the supreme court discussed the standard for determining whether a defendant has acted in a manner that would justify the imposition of punitive damages. The court reaffirmed the Carraway v. Revell, 116 So.2d 16 (Fla.1959), standard:
The character of negligence necessary to sustain an award of punitive damages must be of a "gross and flagrant character, evincing reckless disregard of human life, or the safety of persons exposed to its dangerous effects, or there is that entire want of care which would raise the presumption of a conscious indifference to consequences, or which shows wantonness or recklessness or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which is equivalent to an intentional violation of them."
White, 455 So.2d at 1029 (quoting Carraway, 116 So.2d at 20 n. 12) (citations omitted). See also Eastern Airlines, Inc. v. King, 557 So.2d 574, 578 (Fla.1990) (citing White as the Florida standard for recovery of punitive damages).
In Jeep, this court quoted the holding from Chrysler Corp. v. Wolmer, 499 So.2d 823, 825 (Fla.1986):
Punitive damages are imposed in order to punish the defendant for extreme wrongdoing and to deter others from engaging in similar conduct. They are not intended as a means by which a *559 plaintiff can recover extra damages. Thus, punitive damages are warranted only where the egregious wrongdoing of the defendant, although perhaps not covered by criminal law, nevertheless constitutes a public wrong. Therefore, the question that must be answered utilizing the Carraway standard is whether [the defendant] exhibited a reckless disregard for human life equivalent to manslaughter....
Jeep, 528 So.2d at 1206 (citations omitted). Appellant correctly argues that Jeep equates the standard of proof for punitive damages to "a reckless disregard for human life equivalent to manslaughter." However, manslaughter is defined by section 782.07, Florida Statutes (1991), as "... the killing of a human being by the act, procurement, or culpable negligence of another...."
Culpable negligence is defined in the Jury Instructions as:
[M]ore than a failure to use ordinary care for others. In order for negligence to be culpable, it must be gross and flagrant. Culpable negligence is a course of conduct showing reckless disregard of human life, or for the safety of persons exposed to its dangerous effects, or such an entire want of care as to raise a presumption of a conscious indifference to consequences, or which shows wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or such an indifference to the rights of others as is equivalent to an intentional violation of such rights.
Villafana v. State, 728 So.2d 260, 260-61 (Fla. 5th DCA 1999). See Fla. Std. Jury Instr. (Crim.) at 69. Chrysler and Jeep, therefore, relate the definition of what is required to sustain an award of punitive damages to the standard of culpable negligence, which is essentially the same standard as that used by the Supreme Court of Florida in Carraway and White. See also First Healthcare Corp. v. Hamilton, 740 So.2d 1189 (Fla. 4th DCA 1999). Each element set forth for proving culpable negligence is listed in the disjunctive. Likewise, in determining whether a party is liable for punitive damages under Carraway, the party seeking such damages can meet the standard by presenting proof of any one or any combination of the enumerated factors.
Here, the record shows the derailment occurred in the Hamlet Division of South Carolina. The cause of the derailment was a defective Orlon switch, the defect being a broken crosspin that had been broken for at least seven months prior to the derailment. The Orlon switch had been installed backwards ten years earlier, and part of the broken crosspin was buried under several inches of graphite ballast placed between the ties more than seven months prior to the derailment. The evidence further shows that a proper inspection would have revealed the broken crosspin. In addition, there is evidence that CSX had actual knowledge that the crosspin was defective because the record shows that CSX periodically greased a plate installed on the switch with graphite to make the switch operate.
The record contains evidence that, as early as 1987, the Federal Railroad Administration ("FRA") performed an extensive audit, more fully addressed hereafter, that revealed deficiencies in CSX's staffing and inspection practices. This evidence shows actual knowledge on the part of CSX as to what would constitute proper staffing and inspections. The record also contains evidence that CSX, for a period in excess of ten years before the derailment, began a systematic reduction in its maintenance of way employees (personnel who would have performed inspections and repairs), the resulting benefit to CSX amounting to approximately $2.4 billion. Additionally, CSX filed false safety inspection reports with the FRA stating that proper inspections were performed when they were not. The evidence presented is sufficient to support a jury finding that CSX's actions and conduct meets the standards *560 set forth in Carraway, White and Jeep for an award of punitive damages.
Next, CSX argues that the trial court erred in denying its motion for a new trial. We will address only five of CSX's arguments with respect to this issue.
First, during the punitive damage liability phase of the trial, appellee presented evidence showing that CSX and its predecessors engaged in cutbacks of maintenance of way employees from 1981 through 1993, and that these cutbacks resulted in savings of approximately $2.4 billion for the company. CSX contends that the trial court erred in admitting this evidence because it brought information regarding CSX's wealth before the jury during the liability phase and the evidence introduced was not limited to cutbacks in the Hamlet Division, where the derailment occurred. Evidence of corporate downsizing for profits was relevant to show a motive for CSX continuing such conduct. The evidence of downsizing and the testimony that the limited number of CSX inspectors could not conduct proper inspections of the lengths of track and switches to which they were assigned supports a jury finding of a conscious disregard for the safety of the public. The testimony that the apprentice foreman's supervisor directed him to file false inspection reports with the FRA also supports appellee's argument that CSX knowingly endangered public safety.
Second, CSX contends that the admission of Mrs. Palank's testimony regarding the loss of her husband during the trial on liability for punitive damages was prejudicial and amounted to error. Appellees correctly argue that ordinarily the same jury would hear evidence on both compensatory and punitive damages, and that the admission of this evidence was necessary for the jury to understand the nature of the underlying claim. See W.R. Grace & Co. v. Waters, 638 So.2d 502, 506 (Fla. 1994). We agree and hold that the trial court did not abuse its discretion in allowing the jury to hear the limited evidence concerning the underlying compensatory damage claim.
Third, CSX contends that the trial court erred in allowing evidence of a 1987 FRA audit of the Baltimore Division of CSX's tracks because the audit related to a different division and occurred four years before the derailment.
Following a series of train accidents, the FRA conducted a safety audit of CSX's Baltimore Division, which consists of approximately 5,000 miles of track across six states and the District of Columbia. The Baltimore Audit was based on interviews with numerous CSX officers and employees, a review of over 7,000 test records, inspections of trains, freight cars, tracks, signals, switches, inspection devices and turnouts. Although the audit indicated that the mainline track was in excellent condition, it stated that there were numerous defective conditions on the turnouts which should have been discovered and reported by CSX's inspectors. The report emphasized FRA inspectors' concerns regarding the inadequate training and number of maintenance of way employees, which they concluded threatened CSX's capacity to maintain the track over the long term.
The report stated: "In general, it is FRA's belief that: ... The poor quality of track maintenance and repairs has led FRA to conclude that both line employees and supervisors in the Maintenance of Way Department are inadequately trained in both FRA and CSX maintenance standards." The report also stated that many inspectors were scheduled for five full days of inspecting, with no time allowances for duties such as making repairs, and the FRA suspected that some of CSX's inspectors were not able to cover their territories at the required frequencies. The report concluded:
[M]any track foremen are not actually knowledgeable enough to perform maintenance tasks properly. A suspicion also arises as to the level of expertise of *561 some members of supervision, especially in identifying poor quality work and having it corrected. These two conclusions result in the FRA being concerned over the training and qualifications of these individuals. Although the company has a formal set of maintenance standards, augmented by engineering bulletins, the FRA's observations in the field were that training is spotty and incomplete.
The report also stated:
Of all the areas [illegible] developed during the safety audit, this one regarding the training, qualifications and abilities of the M[aintenace] of W[ay] people concerns the FRA the most. It is not possible to place enough emphasis on this and the deleterious effects it has been having on the physical plant of CSX.
The FRA also stated its concerns that the quality of track inspections was not acceptable because the records did not accurately reflect the conditions existing in the field and defective conditions were not being found or reported and that track inspection territories were too large to be covered at the required frequencies in an effective manner. The audit concluded that the major problem "lies in the shortage of quality inspectors, which in turn translates into overly large inspection districts and hurried cursory inspections."
Even though the deficiencies addressed in the audit were related to a separate division, the deficiencies were strikingly similar to those in the Hamlet Division. The evidence regarding the audit showed prior knowledge of dangerous similar conditions within the system. See Lawrence v. Florida East Coast Ry. Co., 346 So.2d 1012, 1015 (Fla.1977); Rodriguez v. Loxahatchee Groves Water Control Mgmt. Dist., 636 So.2d 1348, 1350 (Fla. 4th DCA), rev. denied, 649 So.2d 233 (Fla.1994). Further, the FRA's general observations regarding the poor quality of track maintenance and repairs, as well as the lack of proper training and inspection practices of employees, provided CSX with ample notice of what was needed to provide proper training procedures and inspection practices. The audit, when considered in conjunction with the testimony concerning the inspection practices in the Hamlet Division, was relevant to demonstrate that CSX had actual prior notice that its practices in the Hamlet Division did not meet the FRA standards.
Fourth, CSX contends that the video deposition testimony of Allen Clamp was irrelevant and should not have been admitted because Mr. Clamp last worked for CSX five years before the derailment. Mr. Clamp testified that he worked as a track man for CSX's predecessor and then CSX; Mr. Clamp later worked as an apprentice foreman from 1983 to 1986 for Buster Bowers, the roadmaster who was responsible, in July of 1991, for inspection of the section of track where the derailment occurred.
Mr. Clamp testified that from what he was taught regarding track inspections and safety, it should have been obvious to CSX that there were too few men to perform the required safety inspections and maintenance. Mr. Clamp also stated that while he was working with Mr. Bowers, Mr. Bowers never performed a disassembly inspection, never walked a switch and conducted no inspection or inadequate inspections by covering too much track too quickly. Mr. Clamp testified that Mr. Bowers directed him to fill out false inspection reports. His testimony shows that conditions similar to those in the Baltimore Division also existed in the Hamlet Division.
Mr. Clamp's successor, Robert Griffith, corroborated his testimony concerning the filing of fraudulent FRA reports regarding track and switch inspections. Although Mr. Clamp left CSX before the derailment, his testimony, along with that of Mr. Griffith, was relevant to show the course of conduct concerning the filing of false inspection reports to the FRA over the *562 course of several years, including the time of the derailment.
Fifth, CSX contends that the trial court erred in allowing the jury to hear evidence regarding CSX's profits and its $5 billion net worth during the final stage of the trial. CSX argues that this evidence should not have been presented to the jury because an indemnity agreement existed between CSX and Amtrak, under which Amtrak would pay any punitive damage award.
CSX failed to present, and we have not found, any Florida law establishing the relevancy of an indemnity agreement that provides for the payment of punitive damages by a third party. Liability for punitive damages and the amount thereof is not determined from the assets of a third party nor from an agreement of a third party to pay such damages. In short, the indemnity agreement was not relevant evidence to the issue of the amount of punitive damages.
For the reasons stated above, we hold that CSX has failed to demonstrate that the trial court erred or abused its discretion in denying its motion for a new trial.
CSX also contends that the trial court should have granted a remittitur pursuant to section 768.73, Florida Statutes (1995), because the punitive damage verdict was excessive. Section 768.73 provides that a punitive damage award may not exceed three times the amount awarded for compensatory damages and is presumed excessive "unless the claimant demonstrates to the court by clear and convincing evidence that the award is not excessive in light of the facts and circumstances which were presented to the trier of fact." See Owens-Corning Fiberglas Corp. v. Ballard, 23 Fla. L. Weekly D1077, 739 So.2d 603 (Fla. 4th DCA 1998), rev. granted, 722 So.2d 193 (Fla.1998).
Judge Franza's nineteen page order specifically details his findings in support of the $50 million verdict and the denial of appellant's motion for a remittitur. The order summarizes the testimony and evidence that supports the jury's verdict by clear and convincing evidence, and concludes, in part,
Here, the clear and convincing evidence shows that upon the presentation of all the testimony and evidence and the conclusion of the trial, CSXT could neither negate nor mitigate the cost of its flagrant violation of the public trust. Keeping with the policy that punitive damages should punish and deter, a jury of six reasonable persons concluded that $50 million would adequately communicate to this Defendant, that this type of reprehensible conduct should not and would not be tolerated.
The jury was presented with an enormous figure by the Plaintiff. However, this jury decided upon $50 million.[[1]] Finally, in rendering their $50 million penalty, jurors included a handwritten note [on the verdict form] to express their concern. They wrote, "It is hoped that CSX trainers will emphasize [the] need to inspect both ends of crosspins."
These are not the words of a run away jury. This was a knowing cognoscente jury and their deterrent punishment, sting, if you will, was very reasonable in light of the assets of Defendant which the uncontradicted evidence showed, was over $5 billion.
. . . .
The knowledge that Defendant's conduct bespoke, an intentional disregard for human safety, was loud and clear. Defendant's repetitive and callous indifference eventually matriculated into an entire want of care without any regard or lack of conscience, for the safety and welfare of the public....
This Court finds the evidence to be clear and convincing, sufficiently showing that Defendant's conduct in breaching *563 its duty, was deliberate, reckless, willful, and wanton, evincing a reckless disregard for the safety of rail passengers and the public at large. This evidence showed that although cost-cutting measures may have saved Defendant over two billion dollars, society paid with eight human lives. The clear and convincing evidence showed that the price of cost-cutting safety to turnover larger profits is too great of a price. This not only bespeaks culpable negligence, it is borderline criminal.
Here, critical rail personnel were cut away leaving virtually no way for the company to sufficiently ensure the safety of the rails. Despite Defendant's allegations that cutting-back maintenance of way personnel caused no hazard, the clear and convincing evidence does not support this contention.
. . . .
Clearly, Defendant knew of the peril created by its reductions and the company chose to proceed on its own course. The evidence showed that federal rail regulators warned the company and that management turned a deaf ear to those persons, just as it did to the company's own front line rail personnel.
In terms of the actual rail inspections, the clear and convincing evidence showed repeated patterns of carelessness. The company carelessly reported and accepted track inspection reports when it was blatantly obvious that the information was false.
However, most damaging was the cross pin itself. It told an entire story about the policy and manner in which Defendant administered its duty to provide safe rail to the thousands of railway passengers known to rely on the company. The evidence showed that to keep the device working, "standard" repairs often included jumping up and down on the switch and/or applying "grease" to the apparatus.
The clear and convincing evidence showed that for at least 7½ months, the cross pin lay on the ground buried in granite ballast. The FRA, upon examining the rail north and south of the Orlon switch, found many defects including another missing cross pin.
. . . .
This Court does not find that the $50 million verdict in the instant matter was influenced by prejudice, passion, or corruption or that the jury misconceived the merits of the case. There is no question in this Court's mind that the jury based its verdict on the evidence presented to it. This Court also finds that the jury did not arrive at the amount of damages by speculation and conjecture. This jury accepted the Plaintiffs testimony and that of her witnesses.
(footnote omitted).
CSX argues that Judge Franza's characterizations that CSX's conduct "showed repeated patterns of carelessness" and "not only bespeaks culpable negligence, it is borderline criminal," contradicted his conclusion that punitive damages were warranted and the amount awarded was sustainable despite the statutory cap. Neither Carraway nor Jeep requires the conduct to be criminal, which would impose a standard of proof beyond a reasonable doubt, a standard much greater than that required for the recovery of punitive damages.
We hold that the evidence presented supports Judge Franza's conclusion that the jury properly awarded punitive damages. We also hold that the record supports Judge Franza's conclusion that appellees successfully rebutted the presumption of excessiveness of the punitive damage award. See § 768.74(5)(a)-(e), Fla. Stat. Further, we reject CSX's argument that the verdict was "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." Lassiter v. Int'l Union of Operating *564 Eng'rs, 349 So.2d 622, 627 (Fla. 1976).
In summary, we hold that the trial court did not err in denying CSX's motions for a directed verdict, for a new trial or for remittitur. Accordingly, we affirm. We also affirm the trial court's award of costs in favor of appellee as the prevailing party.
AFFIRMED.
POLEN and STEVENSON, JJ., concur.
NOTES
[1] In closing, appellees asked for between $275 million and $550 million.