802 So.2d 492 (2001)
HUMANA HEALTH INSURANCE COMPANY OF FLORIDA, INC., a Florida corporation, Appellant,
v.
Mark CHIPPS, individually and for the use and benefit of Caitlyn Chipps, a minor, Appellee.
No. 4D00-866.
District Court of Appeal of Florida, Fourth District.
December 26, 2001.
*493 Jane Kreusler-Walsh of Jane Kreusler-Walsh, P.A., West Palm Beach, Sylvia H. Walbolt and Robert E. Biasotti of Carlton, Fields, Ward, Emmanuel, Smith & Cutler, P.A., St. Petersburg, for appellant.
Marjorie Gadarian Graham, P.A., Palm Beach Gardens, Ricci, Hubbard, Leopold, Frankel & Farmer, P.A., West Palm Beach, and Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, for appellee.

ON APPELLEE'S CONSOLIDATED MOTION FOR REHEARING AND MOTION FOR REHEARING EN BANC
POLEN, C.J.
Following this court's September 19, 2001 opinion, appellee has moved for rehearing and rehearing en banc. We grant the motion for rehearing in part, deny the motion for rehearing en banc, and substitute the following in lieu of the original opinion:
Humana Health Insurance Corporation ("Humana") timely appeals after a jury awarded Mark Chipps, individually and for the use and benefit of his minor daughter, Caitlyn Chipps, $1,028,763 in compensatory damages, and $78,500,000 in punitive damages on Chipps' third amended complaint. *494 We reverse both aspects of the award.

Background
Chipps' daughter, Caitlyn, was born with cerebral palsy. He and Caitlyn had been covered by his employer's predecessor group health insurance company until Chipps was informed that his employer planned to switch plans to Humana effective January 1, 1994. He elected coverage with Humana after its representatives assured him in person that Humana would continue to cover Caitlyn with no loss of benefits. Humana subsequently sent Chipps a letter confirming that it accepted Caitlyn into its Medical Case Management program, available for catastrophically ill children, and that it could not terminate her from the program unless one of three express conditions were met.[1] It is undisputed that these conditions were never met.
For almost two years, Caitlyn's speech, occupational, and physical therapy was covered by Humana. However, On December 1, 1995, two days before her fifth birthday, Humana terminated her from the Medical Case Management program and also her benefits for speech, occupational, and physical therapy. Humana explained that it was terminating such coverage because Caitlyn did not meet Humana's criteria for the program.
Chipps then sued Humana for breach of contract, fraud in the inducement, unfair claims practices, intentional infliction of emotional distress, and promissory estoppel. Humana's liability for compensatory damages on all claims, and for punitive damages under the fraud in the inducement and unfair claims practices counts, was determined by the trial court's striking Humana's pleading as a sanction for discovery violations, and entering a default judgment. Humana then took an interlocutory appeal, resulting in an affirmance by this court. Humana Health Ins. Co. of Florida, Inc. v. Chipps, 748 So.2d 280 (Fla. 4th DCA 1999).
Trial proceeded on the amount of damages to be awarded. Chipps first withdrew his individual claim in Count IV for intentional infliction of emotional distress and proceeded on this claim only on behalf of Caitlyn. Humana objected that this claim had not been pleaded. The court agreed. Chipps' counsel then read language from what the court believed to be the default order which suggested that the court already had ruled on this issue in the Chipps' favor. (Counsel was actually reading from proposed jury instructions.) The court, apparently believing it had already entered a default on this claim, allowed it to proceed.
Chipps showed that after Caitlyn was unilaterally terminated from the Medical Case Management program, she regressed both physically and emotionally. He also showed that Humana's parent company, Humana Inc., made the decision to cut Caitlyn and up to 100 other catastrophically ill children from the Medical Case Management program in an effort to save the company over $78.5 million. Over Humana's objection, some parents of these other catastrophically ill children testified that their children received similar treatment from their insurance companies as Caitlyn. Some of these children were not insured *495 by Humana, but rather by different subsidiaries of Humana, Inc.
Chipps' economic expert testified that Humana's net worth ranged from $56.9 million in 1994 to $43.4 million in 1998. However, he noted that Humana was the beneficiary of an indemnification agreement from its parent corporation, Humana, Inc., who agreed to reimburse Humana for any loss, claim, or demand it suffered in Florida, including punitive damage awards, up to $1.7 billion.
The court instructed the jury, in part, that Humana had intentionally caused Caitlyn to suffer "severe emotional distress." It further instructed that all of the other factors in the standard jury instruction on punitive damages were established as a matter of law, and that the Chipps were "entitled" to recover both compensatory and punitive damages as a matter of law. It did not instruct the jury that it had the discretion to decline to assess punitive damages.
The jury awarded $1 million in compensatory damages on the claim for intentional infliction of emotional distress upon Caitlyn, $28,763 on each of the four claims, and $78.5 million in punitive damages. Post trial, Humana moved for a new trial and for remittitur. In the order denying the motions, the court found that Humana engaged in a scheme to defraud Chipps; that it denied Caitlyn her benefits solely to reduce the cost to the company of medical care it had promised to provide; that Humana's conduct was particularly reprehensible, flagrant, deliberate, and intentional; and that it exhibited a reckless disregard for human life and health as to warrant the substantial punitive damages award. It found that the disparity between the actual and threatened harm and the amount of punitive damages was both reasonable and constitutional. It concluded that the award was supported by substantial competent evidence and was not excessive. This appeal followed.

Merits
Humana argues the trial court reversibly erred when it instructed the jury to award Caitlyn damages for intentional infliction of emotional distress. It maintains that count IV of the third amended complaint alleged damages only suffered by Mark Chipps and not Caitlyn and, that, therefore, the issue had never been pled.[2] We agree. A fair and objective reading of the allegations shows that Chipps was seeking damages for himself individually and not as next friend to his daughter. Humana could not have reasonably anticipated that the prayer for relief in count IV encompassed damages to Caitlyn as opposed to and/or in addition to her father. Accordingly, we reverse the $1 million compensatory damages award.
Because we are reversing this award, we also must reverse the $78.5 million punitive damages award as well. The fact that the jury was allowed to hear evidence relating to Humana's alleged intentional inflict of emotional distress upon Caitlyn may have influenced it to award the Chipps such a large amount of punitive damages.[3]
Another significant reason to reverse the award of punitive damages is that the jury instructions invaded the province of the jury by characterizing the *496 conduct of the defendants. This was an unusual case in that the Chipps had been granted a default on their entitlement to punitive damages.[4] The trial judge instructed the jury that Humana's conduct was "so gross and flagrant as to show a reckless disregard of human life or the safety of persons exposed to the effects of its conduct." The court also told the jury that Humana's conduct "showed such an entire lack of care that Humana must have wantonly and recklessly disregarded the safety and welfare of the public." The court did not instruct the jury that it had the discretion to decline to assess punitive damages or to award only a nominal amount.[5]
To assess punitive damages, a jury must evaluate the degree of "malice, wantonness, oppression, or outrage" demonstrated by the evidence in the case. Owens-Corning Fiberglas Corp. v. Ballard, 749 So.2d 483, 486-87 (Fla.1999). The jury instructions here interfered with the jury's fact-finding function by characterizing and summarizing the evidence. While there is overlap between the issues of entitlement to punitive damages and the amount of such damages to be awarded, care should have been taken to let the jury arrive at its own decision regarding the egregiousness of the defendant's conduct. See, generally, Bankers Multiple Line Ins. Co. v. Farish, 464 So.2d 530, 532 (Fla. 1985).[6]
Along similar lines, we also note that the court improperly prevented Humana from introducing mitigating evidence to rebut testimony that Humana's managed care practices violated industry standards. This testimony reflected on the egregiousness of Humana's conduct, and, thus, may have impacted the amount of damages the jury awarded. The jury should have been allowed to consider any evidence which would have had the effect of "reducing or softening the moral or social culpability attaching to [the defendant's] act...." McClelland v. Climax Hosiery Mills, 252 N.Y. 347, 169 N.E. 605, 608 (1930) (Cardozo, C.J., concurring); see also St. Regis Paper Co. v. Watson, 428 *497 So.2d 243, 246-47 (Fla.1983)(holding the jury, in assessing punitive damages, should consider "the nature, extent, and enormity of the wrong, the intent of the party committing it and all circumstances attending the particular incident, as well as any mitigating circumstances") (citation omitted).
Humana further draws attention to the court's having allowed the parents of several critically ill children to testify about their negative experiences with their health insurers. To the extent that these insurers were not the same as Humana, we hold the court erred. Although they shared the same parent company (Humana, Inc.) and although the Chipps argued that Humana, Inc. acted as an agent for its subsidiaries in scheming to cut Caitlyn and others from the Medical case Management program, Humana, Inc. was not named as a party to this lawsuit. There was no attempt to pierce the parent company's corporate veil or pursue a legal theory that would have allowed the jury to disregard the corporate structure and hold the subsidiaries responsible for each other's conduct. The evidence was irrelevant and unduly prejudicial.[7]
There was at least one other error made at the trial court level. During voir dire, one juror claimed she was never a party to a lawsuit when, in fact, she had been sued in Broward County by a health care provider for allegedly failing to pay her daughter's medical bills. After trial, when told of this information, the court denied Humana's request for a juror interview under Florida Rule of Civil Procedure 1.431(h). Humana made a sufficient showing such that the court should have allowed the interview. See De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995). Because the juror's subject prior lawsuit occurred outside Palm Beach County, our conclusion here does not conflict with our recent opinion in Bornemann v. Ure, 778 So.2d 1077, 1079 (Fla. 4th DCA 2001)(holding lawyers must diligently check the clerk of the court's lawsuit index at some point in the lower court proceedings to determine whether that juror has previously been a party to a lawsuit)(citing Tejada v. Roberts, 760 So.2d 960 (Fla. 3d DCA), review granted, No. SC00-1080, 786 So.2d 1188 (Fla. Nov. 13, 2000)).
Because of these errors discussed above, and given the severity of the total award, we cannot discern from this record whether any or all of these mistakes contributed to the jury's overall verdict. As such, we are constrained to reverse all of the awards and remand this case for a new trial.
Although we are reversing, we address one other issue raised in this appeal that may likely arise at retrial. In this appeal, Humana argues that evidence of its $1.7 billion indemnity agreement with its parent company, Humana, Inc., was irrelevant and should not have been admitted. We disagree. The purposes of punitive damages are served by awarding a sum of money from the defendant which, according to the defendant's financial ability, will hurt but not bankrupt that defendant. Bill Branch Chevrolet, Inc. v. Burkert, 521 So.2d 153, 155 (Fla. 2d DCA 1988). Once Humana claimed that a large award would hurt or bankrupt the company financially, *498 the agreement became relevant for purposes of proving otherwise.
This case is distinguishable from CSX Transportation, Inc. v. Palank, 743 So.2d 556, 562 (Fla. 4th DCA 1999), review denied, 760 So.2d 946 (Fla.) and certiorari denied, 531 U.S. 822, 121 S.Ct. 65, 148 L.Ed.2d 30 (2000), upon which Humana relies. In Palank, this court held that the subject indemnity agreement was irrelevant when offered by the defendant corporation in order to show that a punitive damages award would not have hurt the company. We held that "[l]iability for punitive damages and the amount thereof is not determined from the assets of a third party nor from an agreement of a third party to pay such damages. In short, the indemnity agreement was not relevant evidence...." Id. at 562.
As Palank makes clear, the agreement was being offered for a different purpose and under entirely different circumstances. Thus, our holding in that case does not conflict with our conclusion here. In short, if there was evidence to rebut Humana's assertions that a large award would force the company into financial straits, then it should have been admitted. To hold otherwise would insulate such corporations from payment of these awards. Accordingly, we affirm on this issue.
AFFIRMED in part; REVERSED and REMANDED for further proceedings in accordance with this opinion.
GROSS and TAYLOR, JJ., concur.
NOTES
[1] The conditions for terminating the member's participation in the Medical Case Management program were:

a. The member or guardian did not wish to accept recommended care or treatment, in which case the member would return to regular plan benefits;
b. Coverage under the policy ended; or
c. The individual lifetime maximum benefit had been reached.
[2] Count IV alleged in pertinent part that Humana had "caused the Plaintiff's [sic] severe emotional distress." The prayer for relief sought damages only for "Plaintiff, MARK CHIPPS."
[3] We note that by reversing on this issue we are not passing on the viability of such a cause of action if, on remand, the Chipps request and are allowed to amend their complaint to plead this count.
[4] Only liability for punitive damages resulted from the default. In other words, the effect of the default was narrow in that it merely bypassed the need for bifurcation. The amount of the punitive damages to be awarded, on the other hand, still had to be determined by the jury in its discretion. The jury could have awarded no punitive damages if it had determined that Humana's conduct was not as egregious as the court's instruction made it out to be.
[5] The standard jury instruction on punitive damages in a bifurcated proceeding indicates that even after a jury decides that punitive damages are appropriate, they may still decline to assess any amount in the second stage:

If you decide that punitive damages are warranted, we will proceed to the second stage during which the parties may present additional evidence and argument on the issue of punitive damages. I will then give you additional instruction, after which you will decide whether in your discretion punitive damages will be assessed and, if so, the amount....
[6] On remand, the court may turn to the following jury instruction for guidance in this regard:

You shall now determine the amount of punitive damages, if any, to be assessed as punishment and as a deterrent to others. This amount would be in addition to the compensatory damages you have awarded. In making this determination, you should consider the following:
(1) the nature, extent, and degree of misconduct and the related circumstances; and
(2) the defendant's financial resources; and
(3) any other circumstance which may affect the amount of punitive damages.
You may in your discretion decline to assess punitive damages.
See Fla. Std. Jury. Instr. (Civ.) PD (1).
[7] Even if on remand the Chipps elect and are allowed to amend their complaint to allege a theory that would make the testimony of the other parents admissible, the testimony of these other parents still should not be admitted to show the emotional suffering that their children endured as a result of being terminated from the program. Such evidence would be irrelevant and unfairly prejudicial since it would appeal overtly to the sympathy of the jurors. See § 90.403, Fla. Stat. (1999).