602 S.E.2d 499

**Charles KOCHER, Plaintiff Below, Appellee**

v.

**OXFORD LIFE INSURANCE COMPANY, a corporation, Defendant Below, Appellant.**

**No. 31539.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 27, 2004.

Decided June 17, 2004.

Dissenting Opinion of Justice McGraw July 2, 2004.

Michael W. McGuane, McGuane Law Offices, Robert P. Fitzsimmons, Fitzsimmons Law Offices, Wheeling, for Appellee.

Johnny M. Knisely, II, Thomas R. Goodwin, Goodwin & Goodwin, Charleston, for Appellant.

PER CURIAM:

In this case a jury was incorrectly instructed that it had no discretion with respect to an award of punitive damages; consequently the jury's verdict on punitive damages must be vacated and the case remanded for a new trial on that issue.

## I.

The instant case arises from a lawsuit against the appellant, Oxford Life Insurance Company ("Oxford"), filed by the appellee, Charles Kocher ("Mr. Kocher").

Mr. Kocher became an Oxford policyholder when he purchased a used truck on April 28, 1999. Mr. Kocher financed the truck purchase with a loan in the amount of $11,563.20. The dealership where Mr. Kocher purchased and financed the truck sold Mr. Kocher a credit life and disability insurance policy that was issued by Oxford, the dealership acting as Oxford's agent.

Mr. Kocher paid an up-front premium of more than $700.00 for the insurance. The insurance policy provided that in the event Mr. Kocher became disabled, Oxford would make the monthly truck payments until Mr. Kocher was no longer disabled. The policy also provided "dismemberment coverage" that would pay off the entire loan balance—if Mr. Kocher suffered, *inter alia,* the loss of his foot at or above the ankle joint.

On May 11, 1999, Mr. Kocher suffered a severe injury to his right foot from a tractor accident. After several unsuccessful surgeries over a period of months—surgeries that amounted to progressive amputations—on February 14, 2000, Mr. Kocher's right leg was finally amputated above his ankle, but below his knee.

Shortly after the accident, Mr. Kocher notified Oxford of his injury, seeking benefits under the Oxford policy. Mr. Kocher asserts that Oxford repeatedly, improperly, and unreasonably failed to comply with its duties under the policy, thus breaching Oxford's statutory, contractual, and common-law duties to Mr. Kocher as a policyholder. Oxford denies these assertions. On July 15, 2000, Mr. Kocher filed suit against Oxford, making claims for breach of contract, statutory unfair claims settlement practices, and breach of the implied covenant of good faith and fair dealing.

The lawsuit progressed in the pre-trial discovery phase. According to detailed findings of fact later made by the circuit court, Oxford engaged in substantial litigation misconduct during the pre-trial period—including failure to comply with discovery requests; giving false information about other claims filed against Oxford in West Virginia; and improper deposition conduct. The trial court found that Oxford's litigation misconduct was a continuing pattern of misconduct, and not "isolated occurrences." Our review indicates that the court's findings were well-grounded in the record.

In addition, the circuit court found that Oxford had engaged in a particular instance of extreme litigation misconduct. On or about February 6, 2002, Oxford's Senior Vice President, Larry Goodyear, the company's second-in-command, traveled from the company's office in Arizona to West Virginia, via Pittsburgh, for Mr. Goodyear's deposition. (The trial of the case was set for March of 2002.) In connection with that trip, Mr. Goodyear's secretary in Arizona called Mr. Kocher's home and pretended to be a Federal Express employee who was seeking directions to deliver a package to Mr. Kocher. Using this ruse, the secretary obtained driving directions to Mr. Kocher's house, and relayed those directions to Mr. Goodyear, who paid a visit to Mr. Kocher at Mr. Kocher's home near St. Mary's, West Virginia—and then drove to Huntington, West Virginia, to Mr. Goodyear's attorney's office.

Mr. Goodyear has an undergraduate college degree in psychology and human behavior and a master's degree in business administration. Before visiting Mr. Kocher, Mr. Goodyear advised both Oxford's President and CEO, and Oxford's Compliance Director, of Mr. Goodyear's intention to visit Mr. Kocher. They made no objection. Oxford's Director of Operations had previously attended the deposition of Mr. Kocher, where Oxford's counsel had tried to raise the question of settlement directly with Mr. Kocher, and had been told by Mr. Kocher's counsel that all settlement discussions were to be with Mr. Kocher's counsel.

Neither Mr. Goodyear nor anyone else from Oxford called Mr. Kocher to let him know that Mr. Goodyear was coming. Nor did Mr. Goodyear advise his counsel in West Virginia or Mr. Kocher's counsel of Mr. Goodyear's intended visit.

Mr. Goodyear arrived unannounced at Mr. Kocher's home, and was invited in. Mr. Kocher was not aware of any impropriety in the visit.

According to Mr. Goodyear, he talked to Mr. Kocher "about a lot of stuff. We talked about his accident . . . about trucks a bit . . . fishing . . . my dad had an injury similar to Mr. Kocher's . . . I apologized for how Oxford had treated him [and] as I was leaving Mr. Kocher's house, I made a comment to him, 'Well, can we do anything for you?' He told me, 'No, I've already got counsel and lawyers.' "

According to Mr. Kocher, Mr. Goodyear characterized Oxford as a "mom-and-pop" insurance company, and asked Mr. Kocher, "I don't suppose there's anything I can do here tonight to resolve this matter, or has it went too far with your attorneys?" Mr. Kocher replied "I'm not going to say nothing."[1]

Shortly thereafter, Mr. Kocher's counsel learned of Mr. Goodyear's visit, and sought to obtain more facts about the visit. In a deposition, Mr. Goodyear denied that anyone at Oxford had called Mr. Kocher or had represented themselves as a Federal Express employee in order to obtain directions to Mr. Kocher's house. Mr. Goodyear said that his secretary had obtained directions to Mr. Kocher's home through an Internet site that can in some circumstances give driving directions to particular addresses. However, the record suggests that the particular Internet site did not provide directions to rural route addresses like Mr. Kocher's; and also that its directions do not give information such as "look for a mailbox that has no name on it."

Soon after Mr. Goodyear gave his deposition, Oxford advised the court that Mr. Goodyear's testimony had been erroneous, and that a phone call had been made by Mr. Goodyear's secretary to the Kocher home to obtain driving directions. At trial Mr. Goodyear claimed that at the time of his visit and at the time he gave his deposition, he had no knowledge of such a call. When the trial court ordered Oxford to produce the secretary who Mr. Goodyear said had made the call, Oxford did not do so, saying that she had "resigned." Mr. Goodyear also testified at trial that while he was driving to Mr. Kocher's home, he was in communication via a cell phone with his secretary, who was directing him where to turn, etc., to get to the Kocher home, using the directions that she had obtained from the phone call.[2]

When the circuit judge, in early March of 2002, took up a motion by Mr. Kocher for sanctions based on Oxford's litigation misconduct—including Mr. Goodyear's visit to Mr. Kocher's house—the judge stated that in 31 years of legal experience, he had never seen such egregious act of misconduct by a party to a lawsuit. As a sanction for the misconduct, the judge struck Oxford's defenses and granted judgment to Mr. Kocher against Oxford for liability to Mr. Kocher, and allowed the case to be tried to the jury only on the issue of the actual and punitive damages due to Mr. Kocher.

A damages-only trial was subsequently held, in which substantial testimony and evidence was presented by Mr. Kocher and by Oxford, from which the jury could decide what actual damages they should award to Mr. Kocher, and from which they could consider the issue of punitive damages.

On the issue of punitive damages, the court instructed the jury—over Oxford's objection—that "[i]t will ... be your *duty* to assess punitive damages." (Emphasis added.) Oxford's counsel proffered an instruction telling the jury that it was not required to award any punitive damages; the trial court refused to give this instruction. Oxford pointedly but unsuccessfully objected to the trial court's removal of the element of jury discretion from the jury's instructions with respect to an award of punitive damages.

On March 22, 2002, the jury returned a verdict awarding Mr. Kocher $5,012,039.60 in compensatory damages and $34,000,000.00 in punitive damages. Oxford made a motion for a new trial, and the circuit court entered a lengthy order—with findings of fact, conclusions of law, and citations to the record—denying the motion. Oxford appealed that denial to this Court.

---

1. Mr. Goodyear testified that he did not dispute most of what Mr. Kocher said about the meeting. Evidence presented at trial indicated that Oxford has $770 million in assets and is owned by a larger company with $3.1 billion in assets.

2. The record does not disclose any plausible reason why anyone at Oxford—Mr. Goodyear, his secretary, or anyone else—would either want or need to lie in order to obtain directions to the Kocher home, except in furtherance of the purpose that Mr. Goodyear would arrive at Mr. Kocher's house without Mr. Kocher's (or his attorney's) prior knowledge. The evidence before the circuit court supports the conclusion that Mr. Goodyear's visit to Mr. Kocher was for the purpose of influencing Mr. Kocher to settle the case—without his counsel being present.

Having reviewed all of the grounds asserted in Oxford's Petition for Appeal and the extensive record presented by the parties, this Court granted an appeal to Oxford solely on the issue of the jury's punitive damages award; our decision does not affect or disturb other portions of the jury's verdict.

## II.

This Court's decision herein turns on the issue of whether the jury was erroneously instructed as to its powers and responsibilities, a matter which this Court reviews *de novo.* "Our review of the legal propriety of the trial court's instructions is *de novo.*" *Skaggs v. Elk Run Coal Co., Inc.,* 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996).[3]

The specific issue in the instant case is the propriety of the trial court's requiring the jury to award punitive damages against Ox-

ford. This issue, in a similar situation, was recently addressed in the case of *Humana Health Insurance Company of Florida v. Chipps,* 802 So.2d 492 (Fla.App.2001).

In that case,

Humana's liability for compensatory damages on all claims, and for punitive damages under the fraud in the inducement and unfair claims practices counts, was determined by the trial court's striking Humana's pleading as a sanction for discovery violations, and entering a default judgment.

802 So.2d at 494.

In *Humana,* the trial court, after entering the default judgment as a sanction, instructed the jury that all of the factors in the standard jury instruction on punitive damages had been established as a matter of law, and that the plaintiffs were "entitled" to re-

---

**3.** We observe that the compelling facts of the instant case and applicable law fully support the trial court's ruling imposing sanctions. It should be emphasized that this is not a case of one private litigant innocently seeking to talk directly with another litigant without either party's counsel being present. Rather, this is a case where a sophisticated corporation deliberately lied to a litigant for the purpose of contacting the litigant without his counsel's knowledge, and improperly sought to influence the litigant to settle the case. The comment to Rule 4.2 of the Rules of Professional Conduct states that "parties to a matter may communicate directly with each other." Subject to certain exceptions, the Rule prohibits one lawyer or the lawyer's agent from communicating about a matter with a party who is represented by counsel without the other lawyer's permission. *See State ex rel. State Farm v. Madden,* 192 W.Va. 155, 451 S.E.2d 721 (1994). Oxford acknowledged to the trial judge and the jury at trial that Oxford's conduct in the Goodyear visit incident was "wrong." Oxford is a sophisticated business entity with substantial experience in the world of litigation. The fact that Mr. Kocher's lawyer had specifically advised Oxford at a deposition not to discuss settlement with Mr. Kocher is merely cumulative; Oxford's conduct would have been "wrong" even if Mr. Kocher's lawyer had not had the occasion to make such a statement to Oxford. Oxford's misconduct was a deliberate effort to subvert and circumvent both the attorney-client relationship and the ordinary rules and procedures of litigation. This relationship and these rules and procedures are central to the fair working of our legal system and to the public's confidence in the courts. *See Loatman v. Summit Bank,* 174 F.R.D. 592 (D.N.J.1997) (contact with a represented plaintiff by a defendant party was unwant-

ed, coercive, oppressive, harmful, and invasive of the attorney-client relationship); *Katopodis v. Liberian S/T Olympic Sun,* 282 F.Supp. 369 (D.C.Va.1968) (defendant's conduct in "sneaking" behind the back of an unsophisticated plaintiff's counsel to try to settle a case was "reprehensible" and destructive of confidence in courts). Oxford's "secret visit" misconduct was deserving of severe sanction pursuant to the trial court's inherent powers. "A court 'has inherent power to do all things that are reasonably necessary for administration of justice within the scope of its jurisdiction.' 14 Am. Juris., Courts, section 171." Syllabus Point 3, *Shields v. Romine,* 122 W.Va. 639, 13 S.E.2d 16 (1940). "Included within the circuit court's inherent power is the power to sanction." *State ex rel. Rees v. Hatcher,* 214 W.Va. 746, 749, 591 S.E.2d 304, 307 (2003). A court has, independent of specific statutory-and rule-based schemes, the inherent authority to sanction litigants for egregious, bad-faith conduct that undermines the judicial process. *Chambers v. NASCO,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). *See also Given v. Field,* 199 W.Va. 394, 484 S.E.2d 647 (1997) (default judgment, jury determination on punitive damages); *Fuqua v. Horizon/CMS Healthcare Corp.,* 199 F.R.D. 200 (N.D.Texas 2000) (judgment for punitive damages awarded as sanction for litigation misconduct); *Payne v. Dewitt,* 995 P.2d 1088 (Okla.1999) (judgment for punitive damages entered as discovery sanction); *McAlister v. Slosberg,* 658 A.2d 658 (Me.1995) (judgment for punitive damages entered as discovery sanction). In the face of Oxford's severe misconduct described herein, coupled with a history of substantial other misconduct in the litigation, the trial court in the instant case was acting well within its discretion in imposing the sanctions that it did.

ceive both compensatory and punitive damages as a matter of law. The *Humana* trial court did not instruct the jury that the jury had the discretion to decline to assess punitive damages.

Upon review, the *Humana* appellate court vacated the jury's punitive damage award, concluding that the trial court's instructions erroneously interfered with the jury's discretion. The appellate court directed the lower court's attention to a standard Florida jury instruction telling the jury that the jury shall, if it finds maliciousness, etc. in the defendant's conduct, "determine the amount of punitive damages, *if any* ..." (emphasis added); and further that the jury "may in your discretion decline to assess punitive damages." 802 So.2d at 496 n. 6.

■ In an analogous case from this Court, *Coury v. Tsapis,* 172 W.Va. 103, 304 S.E.2d 7 (1983), we ruled that a default judgment was properly entered against a defendant—including on a count seeking punitive damages—but that the defendant was nevertheless entitled in a damages trial to contest an award of punitive damages. This is consistent with our longstanding law that

> [i]t is ... reversible error ... to peremptorily charge the jury that they *shall* or *should* find exemplary damages, such damages being wholly within the discretion of the jury.

Syllabus Point 7, *Greer v. Arrington,* 72 W.Va. 693, 79 S.E. 720 (1913) (emphasis in original). "The jury is at perfect liberty, no matter how wanton or reckless the defendant has been, to refuse punitive damages[.]" *Pendleton v. Norfolk & Western Railway,* 82 W.Va. 270, 279, 95 S.E. 941, 944 (1918). It is erroneous to state or imply to the jury that the jury does not have such a discretion and liberty. *Id.*

### III.

■ Applying the foregoing principles of law to the instant case, the jury in the instant case was erroneously told that it was required to award punitive damages. While the trial court could properly as a sanction *authorize* the jury to award punitive damages against Oxford, the court could not properly *require* such an award. Conse-

quently, this Court must vacate the jury's punitive damages award and remand the instant case for a new trial solely on the issue of punitive damages.

Reversed and Remanded.

Justice McGRAW dissents and files a dissenting opinion.

McGRAW, Justice, dissenting.

(Filed July 2, 2004)

As usual, the story of this case is going to be that the Court has overturned a "monestrous" or "outrageous" verdict, and as usual, few will notice the monestrous and outrageous conduct on the part of Oxford that produced that verdict. Moreover, reversing the judgment in this case suggests to large, wealthy defendants that we do not have the courage to affirm large punitive awards against them.

The majority opinion does convey the tenor of Oxford's conduct, but a few details provide additional illumination. Mr. Kocher bought a truck, like thousands of West Virginians do every year. As part of that purchase, he paid a premium to Oxford for disability insurance. In return, Oxford promised to pay off his truck in the unlikely event Mr. Kocher became disabled. Unfortunately, only one payment into his ownership of the truck, Mr. Kocher had his foot crushed while he was clearing some land with a brush hog. Doctors immediately cut off most of his foot, but sadly, not quite enough of the foot to suit Oxford.

Unable to walk, much less work, Mr. Kocher made a claim on his policy with Oxford. Amazingly, according to the appellee's brief, Oxford's initial reaction was to accuse him of cutting off his foot to have the truck paid off. Oxford's conduct went downhill from there.

Oxford created one bureaucratic hurdle after another, all in an effort to avoid paying less than $12,000. According to the appellee's brief, Oxford required Mr. Kocher to fill out "continuing claim forms" that required him to travel over 100 miles to obtain the medical information requested in the form. Of course, with only one foot and a stump wrapped in bandages, it was a little hard for

him to get there on his own, and he had to have other people drive him.

Eventually Mr. Kocher lost all of his leg below the knee. During the time that Mr. Kocher was dealing with the amputation of his limb, he also had to contend with multiple letters and phone calls from the company that had financed his truck, all because Oxford had refused to live up to its end of the bargain.

Oxford's horrendous conduct continued after suit was filed, with multiple discovery violations and an ever-changing parade of legal counsel.[1] The *coup de grace*, of course, was the covert mission by Oxford's senior vice president to visit Mr. Kocher's home, complete with the secretary fraudulently posing as a Federal Express agent to get directions. Short of requesting Mr. Kocher's amputated foot as proof of loss, it is hard to imagine what else Oxford could have done to act in bad faith in this case.

As part of the punitive damages portion of the trial, the jury heard evidence that Oxford had 770 million dollars in assets, and was owned by a larger company with over three *billion* dollars in assets. In light of this near-incomprehensible wealth and Oxford's reprehensible conduct, the jury came back with a punitive damage award of $34 million dollars. This is only 5% of Oxford's assets, and a little more than 1% of the parent company's assets. Unfortunately for Mr. Kocher, most people can't count that high.

Too often the general public, and even lawyers, judges, and law professors, fall into the trap of looking at a large verdict and opining "Aw, that's just too much money." But this is a fallacious argument for several reasons. The record indicates that the jury in this case heard evidence regarding the size of Oxford's parent company, and just what dollar figure would trigger an investigation of that company by the proper authorities. The jury then issued a verdict very close to that amount. This was no accident, and this is not outrageous or unjust. It is only because

we have trouble comprehending the numbers that the verdict seems improper.

Punitive damages exist not only to punish, but to deter as well. "Punitive damages are damages, other than compensatory or nominal damages, awarded against a person to punish him [or her] for his outrageous conduct and to deter him and others like him from similar conduct in the future." Restatement (Second) of Torts § 908(1) (1979). Often, when very large companies with very large profits are considered, we foolishly we abandon the second purpose. My fear is that the majority was seduced by the simplistic notion that some damage awards are "just too big." Along these lines, Oxford calls our attention to the U.S. Supreme Court case of *State Farm v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) and its discussion of ratios between compensatory and punitive damages.

More interesting than the majority opinion, which has adopted this overt fear of large numbers, is the dissent of Justice Scalia. Rarely described as a friend of the plaintiffs' bar, Scalia said in *Campbell*:

> I adhere to the view expressed in my dissenting opinion in *BMW of North America, Inc. v. Gore*, 517 U.S. 559, 598–99, 116 S.Ct. 1589, [1610–11,] 134 L.Ed.2d 809 (1996), that the Due Process Clause provides no substantive protections against "excessive" or " 'unreasonable' " awards of punitive damages. I am also of the view that the punitive damages jurisprudence which has sprung forth from *BMW v. Gore* is *insusceptible of principled application;* accordingly, I do not feel justified in giving the case *stare decisis* effect.

*Campbell,* 538 U.S. at 429, 123 S.Ct. at 1526, 155 L.Ed.2d at 608 (2003) (Scalia J., dissenting) (emphasis added). In *Gore*, the Court overturned a large punitive verdict in favor of an Alabama man who discovered that the "new" BMW he purchased had been repainted by the company and then sold as "brand new," and BMW had done this more than 900 times to other consumers over a period of

---

1.  I note that able appellate counsel did not represent Oxford until after the trial, and that Oxford's trial counsel was not retained until shortly before the trial, and had nothing to do with the pattern

of discovery violations. Indeed, both trial and appellate counsel faced a significant challenge in representing a client as appealing and cooperative as Oxford.

several years. In his dissent to that case, Scalia blasts the entire notion of applying a substantive due process guarantee to punitive damages and explains that the majority was really just substituting its view of "fairness" for the jury's:

Today's decision, though dressed up as a legal opinion, is really no more than a disagreement with the community's sense of indignation or outrage expressed in the punitive award of the Alabama jury, as reduced by the State Supreme Court.

*Gore,* 517 U.S. at 600, 116 S.Ct. at 1611, 134 L.Ed.2d at 842 (Scalia J., dissenting). With all due respect to the other members of this Court, much the same could be said about the majority opinion in Mr. Kocher's case.

Speaking of the three "guideposts" erected by the majority in *Gore,* Scalia notes that they are of little help, and actually highlight the arbitrary nature of the majority opinion in *Gore:*

Of course it will not be easy for the States to comply with this new federal law of damages, no matter how willing they are to do so. In truth, the "guideposts" mark a road to nowhere; they provide no real guidance at all....

The Court has constructed a framework that does not genuinely constrain, that does not inform state legislatures and lower courts—that does nothing at all except confer an artificial air of doctrinal analysis upon its essentially ad hoc determination that this particular award of punitive damages was not "fair."

*Gore,* 517 U.S. at 605–06, 116 S.Ct. at 1613–14, 134 L.Ed.2d at 845–46 (Scalia J., dissenting). This is the logical conundrum the high Court and this Court find themselves in when trying to prove that a punitive award is too big—simply because it looks or feels that way to a human mind that does not easily digest large numbers.

Resorting to the sort of examples teachers use with children, a million seconds is over 11 days, but a billion is almost 32 years. The mind rebels at such numbers. The majority noted that Oxford's parent company was worth $3,100,000,000 and that the jury awarded $34,000,000. The award still appears enormous. However, if with some ze-ros removed we learned that Oxford's parent company was worth $310,000 and the jury awarded punitive damages of $3,400, nobody would bat an eye, or even "raise a suspicious judicial eyebrow," *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 481, 113 S.Ct. 2711, 2732, 125 L.Ed.2d 366, 394 (1993) (O'Connor J., dissenting).

The majority opinion deserves credit for not openly embracing the seductively simple arguments of *Campbell* and *Gore,* but I fear some of that logic has affected the decision to reverse this case. A blind adherence to an arbitrary upper limit or the application of any ratio to a punitive damage award means that, we, as a country, will punish the corner gas station more than a world-wide giant, or the local coffee shop more than some national chain, simply because the giant companies are too wealthy for us to understand. The message we send is, if you are big enough, you can pretty much do what you want.

Because I think the majority opinion sends just this message to Oxford and companies similarly situated, I must respectfully dissent.