697 S.E.2d 139

STATE of West Virginia ex rel. RICHMOND AMERICAN HOMES OF WEST VIRGINIA, INC. and M.D.C. Holdings, Inc., Petitioners,

v.

Honorable David H. SANDERS, Judge of the Circuit Court of Jefferson County, Breeden Mechanical, Inc., J.S.C. Concrete, Inc., Kevin Joy, Loudon Valley Concrete, Inc., Modern Enterprises, Inc., North Star Foundations, Inc., Respondents.

No. 35440.

Supreme Court of Appeals of West Virginia.

Submitted March 31, 2010.

Decided June 16, 2010.

Niall A. Paul, Charles L. Woody, Spilman, Thomas & Battle, PLLC, Alvin L. Emch, Jackson Kelly, PLLC, Charleston, WV, for Petitioners.

Andrew C. Skinner, Laura C. Davis, Stephen G. Skinner, Skinner Law Firm, Charles Town, WV, for Respondents, Skinner Plaintiffs.

James Graham Bordas, III, Christopher J. Regan, Bordas & Bordas, PLLC, Wheeling, WV, for Respondents, Plaintiffs Kevin Joy, et al.

McHUGH, Justice:

This case is before the Court on a petition for a writ of prohibition. Two of the eight defendants below,[1] Richmond American Homes of West Virginia, Inc. (hereinafter "Richmond") and M.D.C. Holdings, Inc., (hereinafter "MDC"),[2] invoke the original jurisdiction[3] of this Court in an effort to enjoin enforcement of the November 4, 2009, and November 18, 2009, orders of the Circuit Court of Jefferson County. The orders resulted in the striking of Petitioners' defenses and default judgment entered against them on the issue of liability in the underlying tort litigation based on the allegation of the plaintiffs below (hereinafter "Respondents") that inadequate radon mitigation systems were installed in their homes.[4] Petitioners maintain that the circuit court exceeded its legitimate powers in issuing such harsh sanctions, which warrants the issuance of a writ of prohibition with direction to the lower court to vacate the orders. Upon due consideration of the briefs and arguments of counsel, review of numerous exhibits supplied by the parties[5] and examination of the relevant law, we issue the writ of prohibition as moulded.

## I. Factual and Procedural Background

Richmond and MDC as its parent company have built a number of houses in the Eastern Panhandle of West Virginia, including the homes in the Locust Hill Subdivision in Jef-

1. The remaining six defendants, subcontractors of Richmond, did not join in the petition; they have raised cross-claims and third-party claims in the underlying case. The six defendants include: Breeden Mechanical, Inc., DIW Group, Inc. d/b/a Specialized Engineering, Inc., North Star Foundations, Inc., Modern Enterprises, Inc., J.S.C. Concrete Construction, Inc., and Louden Valley Concrete, Inc.

2. Richmond and MDC will be referred to collectively as "Petitioners."

3. See W.Va. Const. art. VIII, § 3; W.Va.Code § 53–1–1; W.Va. R.App. P. 14.

4. Three cases involving nearly 200 plaintiffs and eight defendants were consolidated for discovery. The cases include: Civil Action No. 08–C–204,

*Kevin Joy, et al. v. Richmond American Homes of West Virginia, Inc., et al.*; Civil Action No. 08–C–431, *Charles Bauer, et al. v. Richmond American Homes of West Virginia, Inc., et al.*; and, Civil Action No. 08–C–447, *Michael Saliba, et al. v. Richmond American Homes of West Virginia, Inc. et al.* According to the headings on the orders, the November 4, 2009, order before us was entered solely in Civil Action No. 08–C–204, the *Joy* case, whereas the November 18, 2009, order was entered for all three cases. The petition for writ of prohibition before us was filed naming only the *Joy* plaintiffs.

5. During the pendency of this proceeding, the parties moved to supplement their submissions with the full transcript of the hearing before the discovery commissioner and a deposition of Richmond's President, which motions were granted.

ferson County, West Virginia. Presumably the houses were built and sold with some representation made by the companies that the houses had radon mitigation systems. In December 2006, homeowners in the Locust Hill Subdivision contacted Richmond through an attorney and fellow homeowner, Andrew Skinner, regarding problems with the radon systems the company installed in their homes. According to an exhibit filed with the petition in this case,[6] Richmond's corporate counsel sent a letter to Mr. Skinner offering to remediate the problems with the radon systems, which offer Mr. Skinner rejected. In May 2008, Mr. Skinner filed the complaint in the *Joy* case on behalf of sixteen Locust Hill Subdivision homeowner families (consisting of sixty-six individuals) against Richmond, MDC and six Richmond subcontractors. *See* n. 1 *supra.* Two other related cases were filed in the fall of 2008. *See* n. 4 *supra.* The initial trial date in the *Joy* case was set for April 2010. The assertions made in all of the suits are based on the improper installation of radon mitigation systems in the homes, with particular allegations that homes were built with no radon removal system, a defective system or a fake system, which is apparently the reason why the cases were consolidated for discovery purposes.

The writ of prohibition sought in this case involves two intertwined orders[7] issued by the lower court after hearing was held on "Plaintiffs' Motion for Default Judgment, Motion to Strike the Defendants' Answers and Defenses, Motion for Sanctions." The sanctions were imposed as a result of the lower court finding that Richmond had "engaged in a pattern of extensive litigation misconduct." The misconduct identified in the orders included: (1) direct contact by letter of Richmond's President, Patrick Annessa, to some of the homeowners in the *Joy* case over the homeowners' counsels' prior objection to such contact; (2) discovery misconduct; and (3) attempts during a settlement conference by Richmond's in-house counsel to enter into discussions with the homeowners' counsel about potential employment with the company. The information supplied in this proceeding regarding each of these subjects follows.

**Annessa Letter**

According to copies of e-mails supplied by the parties before us, Richmond renewed its remediation efforts after the *Joy* suit was filed. Richmond's counsel retained to defend the company in the *Joy* suit sent an e-mail in March 2009 to Mr. Skinner asking for a list of clients who had not yet had active radon systems installed in their homes. In an April 2009 e-mail, Richmond's retained counsel attached a draft letter for Mr. Skinner's clients from Richmond's President, Patrick Annessa, outlining Richmond's offer to arrange for the installation of active radon detection systems. In that e-mail, Richmond's counsel asked: "Please let me know by Tuesday (4/14/09) if you will accept the letter on behalf of your clients or if Mr. Annessa should send a letter to each of your clients directly." Mr. Skinner's colleague, Laura Davis, responded by return e-mail disputing portions of the letter and stating: "I cannot agree to permit this communication to be sent directly to represented parties in the litigation. I agree that it is wise to formalize the terms of remediation in writing. However, I would prefer that you do so in correspondence to us as opposed to our clients." According to the affidavits of two of the attorneys retained to represent Richmond dated August 27, 2009,

---

**6.** The information we have in this case has been supplied as exhibits accompanying the briefs, providing only a sketchy outline of what has occurred in this case. While court orders, the transcript of the hearing on the motions for default judgment and sanctions and the transcript of the hearing before the discovery commissioner are among the exhibits submitted, no certified portion of the official court record accompanied the petition.

**7.** Respondents note in their brief that the reason for two orders lies in local practice. One order, requested by the trial court at the end of the hearing, serves as a "minute order" by noting the appearances and the action at the hearing (Hearing Order). The other order involves the sanction imposed (Sanction Order) which was submitted with the motion itself since local practice requires that an order granting a motion accompany the motion when it is filed. In the present case, the lower court did not announce the sanction it would impose until after the hearing, but the Sanction Order is dated earlier (November 4, 2009) than the Hearing Order (November 19, 2009).

negotiations regarding the contents of the letter continued, but Respondents' counsel never accepted the letter on behalf of their clients nor did they agree to give the letter to their clients. In June 2009,[8] a letter signed by Mr. Annessa [9] was sent to at least eleven of the sixteen families involved in the *Joy* case.[10]

## Discovery

In preparing for trial, Respondents served MDC and Richmond with a set of interrogatories, request for production of documents and request for admissions along with the *Joy* complaint. Apparently a second, third and fourth set of interrogatories and request for production of documents in the *Joy* case were subsequently delivered to MDC and Richmond. Respondents maintain that MDC completely ignored the discovery requests for over a year.[11]

Respondents filed two motions to compel discovery from Richmond which were taken up by the trial court at a scheduling conference on March 12, 2009.[12] In the June 24, 2009, order resulting from the scheduling conference, the lower court ruled on the motions to compel as follows:

1. *Plaintiff's Motion to Compel Discovery Responses from Defendant Richmond.*

Plaintiffs and defendant Richmond shall, on or before April 1, 2009, meet and confer in good faith in our [sic] effort to resolve the discovery issues raised or presented in plaintiffs' currently pending motions to compel discovery responses. In the event the plaintiffs' [sic] and defendant Richmond are unable to resolve the discovery issues on or before April 1, 2009, the discovery issues shall be referred to Oscar W. Bean, Esquire, of Moorefield, West Virginia, as discovery commissioner, and Mr. Bean is hereby directed to make written recommendation to this Court as to a resolution of the discovery issues.

The parties dispute whether Richmond complied with the directive in the June 24, 2009, order to "meet and confer," but nonetheless, the discovery issues were submitted to the discovery commissioner before whom a hearing was held on September 23, 2009. As the parties confirmed during oral argument, no recommended order was submitted to the court by the discovery commissioner, nor had the trial court issued any order compelling discovery.

## Employment Offer

Mr. Skinner filed an affidavit with the court [13] in which he stated that, while at a

---

**8.** The parties agree that the letter was sent in June 2009 despite the fact that the date of July 15, 2009, appears on the face of the letter.

**9.** The body of the Annessa letter sent on Richmond letterhead reads as follows:
My name is Patrick Annessa. I am President of Richmond American Homes of West Virginia. On April 3, 2009, I sent an offer letter to your attorney. This was an unconditional offer to install a radon reduction system in your home, free of charge. It is my understanding that your attorney chose not to send this letter to you; therefore I am making the offer directly to you. We are offering to hire a licensed subcontractor to unconditionally install a radon-reduction system or to reimburse you should you choose to have an independent company install such a system. This offer is intended to be admissible in court should this lawsuit progress. Our offer is not intended to be a full settlement of all your claims and you can continue to pursue your lawsuit if you chose [sic] to do so.
We have not been give the opportunity to fully inspect and/or repair your home, and by making this offer we do not admit any fault or liability in the construction of your home.

If you want to say "YES" to this offer and schedule an appointment, please mark the box "YES" and return this letter to Charlene Currin at 12220 Sunrise Valley Drive, Suite 400, Reston, Virginia 20191. Please provide your contact information and best times for us to reach you, in the space provided below. Once we receive your "YES" reply, we will then contact you to schedule your appointment.

**10.** The November 4, 2009, order notes that letters were also sent to plaintiffs in the *Bauer* and *Saliba* companion cases.

**11.** According to a footnote in the November 4, 2009, order, the lower court denied MDC's motion for dismissal on May 19, 2009, and following this ruling MDC indicated that it adopted Richmond's discovery answers as its own.

**12.** Neither the motions nor a transcript of the March 12, 2009, proceedings were submitted as exhibits.

**13.** The affidavit was an exhibit attached to Respondents' motion for sanctions.

two-day mediation meeting in the *Joy* case in January 2009, he was approached before the meeting began by the in-house attorney representing MDC. The affidavit represents that after the in-house counsel informally expressed her settlement concerns in the three pending radon lawsuits, she asked Mr. Skinner to consider becoming MDC's lawyer to coordinate its nationwide radon litigation. Mr. Skinner stated in the affidavit that his "impression from this offer was that Richmond American Homes sought both to create a conflict between me and my clients and to conflict me out of future radon cases."

A motion for sanctions seeking default judgment and striking Richmond's answers and defenses was filed by Respondents. Although the Annessa letter was the springboard for filing the motion, Respondents also raised the discovery issues and the job offer as demonstration of a pattern of litigation misconduct supporting the sanction request. The matter of sanctions was the primary issue addressed by the trial court at a hearing on October 30, 2009. Over Respondents' objection,[14] the court permitted Petitioners to call Forest J. Bowman, retired West Virginia University College of Law Professor, to testify regarding the propriety of communication between the parties in the form of the Annessa Letter. At the conclusion of the hearing, the trial judge determined that sanctions would be imposed without deciding what sanctions would be appropriate. The nature of the sanctions was announced in the order dated November 4, 2009. However, both the November 4 and November 18, 2009, orders relate findings the lower court made in arriving at the sanctions of granting the motions for default judgment and striking the defenses. In these orders the lower court in essence found that: the Annessa Letter was an unauthorized communication which contained false statements and attempted to undermine the relationship be-

tween the plaintiffs and their counsel; Respondents failed to cooperate fully in the discovery process; and the MDC job offer of employment was an improper attempt to subvert the plaintiffs' counsel to work against the interests of his clients. The lower court stated in the November 18, 2009, order that the identified acts of the defendants "taken together ... make a picture of not only obstructionist conduct, but [also] a desire to fragment the efforts of the Plaintiffs in this litigation and as such, the aggregated conduct of Richmond merits sanctions."[15]

Richmond subsequently invoked this Court's original jurisdiction, seeking a writ of prohibition to stop the enforcement of the two orders. On January 14, 2010, this Court issued a rule to show cause why a writ of prohibition should not be granted.

## II. Standard of Review

■■■ This Court has long maintained that "[p]rohibition lies only to restrain inferior courts from proceeding in causes over which they have no jurisdiction, or, in which, having jurisdiction, they are exceeding their legitimate powers and may not be used as a substitute for writ of error, appeal or certiorari." Syl. Pt. 1, *Crawford v. Taylor*, 138 W.Va. 207, 75 S.E.2d 370 (1953). In cases such as here where Petitioners maintain that a circuit court exceeded its legitimate powers in addressing a matter within its jurisdiction, we consider five factors in determining whether to entertain and issue the writ of prohibition. Syl. Pt. 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996). These general guidelines include:

> (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of

---

**14.** Respondents' objection to the testimony was based on the holding in syllabus point five of *Jackson v. State Farm Mut. Automobile Ins. Co.*, 215 W.Va. 634, 600 S.E.2d 346 (2004), that an expert witness is not permitted to offer an opinion as to the interpretation of the law.

**15.** The November 4, 2010, order contained the following clarification:

> "24. These actions by the Richmond American Defendants appear to be entirely the acts of the Richmond American Defendants themselves and their in-house counsel. Evidence has not surfaced indicating involvement in these actions by its outside counsel at Spillman [sic], Thomas & Battle."

law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression.

*Id.*

We turn now to weigh these considerations in light of the matters presented in the pending case.

### III. Discussion

■ The particular issue we are called upon to review in this case is the imposition of sanctions by the lower court, to which we apply an abuse of discretion standard. *See Bartles v. Hinkle*, 196 W.Va. 381, 389, 472 S.E.2d 827, 835 (1996) (" 'A primary aspect of . . . [a trial court's] discretion is the ability to fashion an *appropriate* sanction for conduct which abuses the judicial process.' *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45, 111 S.Ct. 2123, 2132–33, 115 L.Ed.2d 27, 45 (1991)." (Bracketed language and emphasis in original.)). However, we remain mindful that the threshold for issuing a writ of prohibition is greater than a finding of abuse of discretion. Syl. Pt. 2, *State ex rel. Peacher v. Sencindiver*, 160 W.Va. 314, 233 S.E.2d 425 (1977) ("A writ of prohibition will not issue to prevent a simple abuse of discretion by a trial court.").

■ The primary focus of the arguments in this proceeding involve the propriety or impropriety of the Annessa Letter, Petitioners' conduct during discovery and the MDC offer of employment as the basis for imposing sanctions in this case. Before addressing these particular matters we must first examine the basis of authority the lower court relied upon to impose sanctions. It is clear

that "before issuing a sanction, a court must ensure it has an adequate foundation either pursuant to the rules or by virtue of its inherent powers to exercise its authority." Syl. Pt. 1, in part, *Bartles v. Hinkle*, 196 W.Va. 381, 472 S.E.2d 827 (1996).

■ In its November 4, 2009, order announcing the sanctions, no single base of authority was explicitly relied upon by the lower court. With regard to some discovery misconduct, the trial court cited to Rule 37(b)(2)[16] of the Rules of Civil Procedure for its authority to sanction. However, no orders to compel discovery were entered by the lower court, with resolution of disputed discovery issues referred to a discovery commissioner. Our review of the transcript of the hearing before the discovery commissioner revealed that both sides had agreed to comply with supplying and/or supplementing discovery within the parameters fixed by the commissioner. The parties represented during oral argument that the lower court did not have before it any recommendations from the discovery commissioner when it was decided that sanctions were warranted. It is established law in this state that striking of pleadings and rendering a default judgment for a discovery violation pursuant to Rule 37(b) of the Rules of Civil Procedure will only be upheld if willfulness, bad faith or fault of the party disobeying the *order to compel* is established through an evidentiary hearing and in light of the full record before the trial court. Syl. Pt. 2, *Bell v. Inland Mut. Ins. Co.*, 175 W.Va. 165, 332 S.E.2d 127 (1985). Those prerequisites can not be satisfied in this case as there existed no order compelling discovery on which willfulness, bad faith or fault could be established.

---

16. Rule 37(b)(2) provides in pertinent part as follows:

(b) Failure to comply with order.

\* \* \* \* \* \*

(2) Sanctions by court in which action is pending. If a party or an officer, director, or managing agent of a party or a person designated under Rules 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to supplement as

provided for under Rule 26(e), or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

\* \* \* \* \* \*

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party.

The November 4, 2009, order also relies upon "[t]his Court's inherent authority to administer justice ... to remedy this situation...." Therefore, we surmise that since no identifiable rule or statute governs the entire pattern of litigation misconduct for which sanctions could be imposed that the sanctions were imposed as an exercise of the inherent power of the court.

■ We have not previously addressed whether and under what circumstances a court may impose a default judgment as a sanction pursuant to the "inherent power [of a court] to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction." Syl. Pt. 3, in part, *Shields v. Romine*, 122 W.Va. 639, 13 S.E.2d 16 (1940) (internal quotation and citation omitted). In the federal courts, there is no limit as to the type of sanction which may be imposed pursuant to a court's inherent power. As observed by one federal court of appeals:

> When rules alone do not provide courts with sufficient authority to protect their integrity and prevent abuses of the judicial process, the inherent power fills the gap. As early as 1812, the Supreme Court stated that "[c]ertain implied powers must necessarily result in our courts of justice, from the nature of their institution," explaining that such powers "cannot be dispensed with in a court, because they are necessary to the exercise of all others." *United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34, 3 L.Ed. 259 (1812). The inherent power encompasses the power to sanction attorney or party misconduct, and includes the power to enter a default judgment. Other inherent power sanctions available to courts include fines, awards of attorneys' fees and expenses, contempt citations, disqualifications or suspensions of counsel, and drawing adverse evidentiary inferences or precluding the admission of evidence.

*Shepherd v. American Broadcasting Companies, Inc.*, 62 F.3d 1469, 1474–1475 (D.C.Cir. 1995) (some internal citations omitted). Moreover, the United States Supreme Court in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), while discussing the potency of a court's inherent power to sanction recognized that even though the sanction of dismissal is "particularly severe ... [it] is within the court's discretion." *Id.* at 45, 111 S.Ct. 2123. It is later stated in *Chambers* "that the inherent power of a court [to sanction] can be invoked even if procedural rules exist which sanction the same conduct." 501 U.S. at 49, 111 S.Ct. 2123. The inherent power of courts to sanction also provides courts with a means to impose sanctions fashioned to address unique problems which may not be addressed within the rules. *Id. Also see generally* 5A C. Wright & A. Miller, *Federal Practice and Procedure:* Civil 3d § 1336 (2004). Following this reasoning we find that the inherent power of courts to sanction misconduct includes the authority to enter default judgment orders in appropriate circumstances.

■ The essential parameters governing the imposition of sanctions for misconduct of a party were formulated by Justice Cleckley in syllabus points one and two of *Bartles v. Hinkle*, 196 W.Va. 381, 472 S.E.2d 827 (1996). In Syllabus point one of *Bartles*, the general considerations applicable to sanctions are set forth as follows:

> Although Rules 11, 16, and 37 of the West Virginia Rules of Civil Procedure do not formally require any particular procedure, before issuing a sanction, a court must ensure it has an adequate foundation either pursuant to the rules or by virtue of its inherent powers to exercise its authority. The Due Process Clause of Section 10 of Article III of the West Virginia Constitution requires that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case. Thus, a court must ensure any sanction imposed is fashioned to address the identified harm caused by the party's misconduct.

The process trial courts follow in determining the appropriate sanction within the contours of a given case is addressed in syllabus point two of *Bartles*:

> In formulating the appropriate sanction, a court shall be guided by equitable princi-

ples. Initially, the court must identify the alleged wrongful conduct and determine if it warrants a sanction. The court must explain its reasons clearly on the record if it decides a sanction is appropriate. To determine what will constitute an appropriate sanction, the court may consider the seriousness of the conduct, the impact the conduct had in the case and in the administration of justice, any mitigating circumstances, and whether the conduct was an isolated occurrence or was a pattern of wrongdoing throughout the case.

196 W.Va. at 384, 472 S.E.2d at 830. The *Bartles* case was an appeal of a trial court's order sanctioning defendants for failing to comply with discovery orders. Although the specific issue in *Bartles* involved rule-based authority to impose sanctions, nothing in our discussion or rulings in *Bartles* limits the holdings in that case to instances when sanctions are imposed pursuant to provisions of a rule. *See State ex rel. Rees v. Hatcher*, 214 W.Va. 746, 749 n. 2, 591 S.E.2d 304, 307 n. 2 (2003). The same general process regarding imposition of sanctions applies whether a trial court is proceeding under the authority of rule, statute or its inherent authority.

As previously mentioned, we review imposition of sanctions under an abuse of discretion standard. However, as made clear in *Bartles*, this does not mean that we rubber stamp the sanction decisions of trial courts. Instead, we determine whether the trial court acted within its discretion by examining the factual situation in each case to determine if the "sanction imposed is fashioned to address the identified harm caused by the party's misconduct." 196 W.Va. at 390, 472 S.E.2d at 836.

Petitioners stress that appellate review of the existence of an adequate foundation and proper formulation of a sanction requires close scrutiny, especially in situations where the sanction imposed serves to end litigation of a case. They note that the U.S. Supreme Court has emphasized that a court's inherent powers "must be exercised with restraint and discretion" "[b]ecause of their very potency" and the potential for arbitrariness and abuse. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). They also point to this Court's reflection in *Dimon v. Mansy*, 198 W.Va. 40, 45, 479 S.E.2d 339, 344 (1996), that "there is always the unseemly danger of overreaching when the judiciary undertakes to define its own power and authority."

The need for restraint and discretion is a refrain repeated in federal court decisions involving the review of orders of dismissal and default judgment levied as sanctions. *See e.g. Estate of Solis–Rivera v. U.S.*, 993 F.2d 1, 2 (1st Cir.1993) (finding that because dismissal with prejudice is a harsh sanction it should only be used when misconduct is extreme); *Barnhill v. U.S.*, 11 F.3d 1360, 1367 (7th Cir.1993) (observing sanctions of dismissal with prejudice and default judgment as draconian for infrequent use by trial courts when there is a clear record of delay or contumacious conduct.); *Halaco Engineering Co. v. Costle*, 843 F.2d 376, 380 (9th Cir.1988) ("In cases where the drastic sanctions of dismissal or default are ordered, the range of discretion for a district court is narrowed and the losing party's non-compliance must be due to willfulness, fault, or bad faith."). This concern for restraint has led some federal courts of appeal to adopt the heightened standard of clear and convincing evidence of abusive conduct to review of orders ending litigation entered pursuant to the inherent authority of the court. *See Shepherd v. American Broadcasting Cos., Inc.* 62 F.3d 1469 (D.C.Cir.1995); *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 71 (2d Cir.2000). However, other circuits have not established any heightened proof requirement and apply the same considerations which are applied when such litigation ending orders are entered as sanctions pursuant to the rules of civil procedure. The Ninth Circuit Court of Appeals has said that "[d]ismissals under a court's inherent powers are subject to much the same considerations as those under the Federal Rules of Civil Procedure." *Halaco Engineering Co. v. Costle*, 843 F.2d 376 (9th Cir.1988). Among the considerations enumerated in *Halaco* is the presence of willfulness, bad faith, or fault by the offending party.

This Court proceeds in its review of orders of dismissal and default judgment

cases pursuant to rule-based sanction authority with similar circumspection. As was stated in *Cattrell Cos. v. Carlton, Inc.*, 217 W.Va. 1, 14, 614 S.E.2d 1, 14 (2005), "dismissal and default [judgment] are [considered] drastic sanctions that should be imposed only in extreme circumstances.". *See also Doulamis v. Alpine Lake Prop. Owners Ass'n, Inc.*, 184 W.Va. 107, 112, 399 S.E.2d 689, 694 (1990) (stating that "dismissal, the harshest sanction, should be used sparingly and only after other sanctions have failed to bring about compliance."); *Bell v. Inland Mut. Ins. Co.*, 175 W.Va. at 172, 332 S.E.2d at 134 (1985) (advising that the sanction of default judgment "should be used sparingly and only in extreme situations [in order to effectuate] the policy of the law favoring the disposition of cases on their merits."). The issue raised in *Cattrell* was the imposition of default judgment as a sanction for a discovery violation pursuant to Rule 37(d) of the West Virginia Rules of Civil Procedure. Due to the severity of sanctions serving to end litigation, this Court established that such sanctions may not be imposed without the trial court first making findings establishing the willfulness or bad faith on the part of the offending party. Syl. Pt. 6, 217 W.Va. at 3, 614 S.E.2d at 3. The approach comports with our earlier decision in *Bell v. Inland Mutual Insurance Company*, which holds that the sanctions of striking pleadings and rendering a default judgment under Rule 37(b) of the Rules of Civil Procedure for a party's failure to obey an order compelling discovery will only be upheld when it is demonstrated that the failure to comply with the order is due to willfulness, bad faith or fault. Syl. Pt. 2, 175 W.Va. at 168, 332 S.E.2d at 129. Seeing no reason to impose a different standard under the present circumstances, we hold that imposition of sanctions of dismissal and default judgment for serious litigation misconduct pursuant to the inherent powers of the court to regulate its proceedings will be upheld upon review as a proper exercise of discretion when trial court findings adequately demonstrate and establish willfulness, bad faith or fault of the offending party.

█ Having found that the trial court had an adequate foundation in its inherent powers to impose the sanctions of striking pleadings and defenses and entering default judgment, we move to the next step of determining whether the lower court abused its discretion regarding appropriateness issues as set forth in *Bartles*. Under the provisions of syllabus point two of *Bartles*, our review actually involves a two-step process of first examining whether the sanctioning court identified the wrongful conduct with clear explanation on the record of why it decided that a sanction was appropriate. 196 W.Va. at 384, 472 S.E.2d at 830. We then must determine whether the sanction actually imposed fits the seriousness of the identified conduct in light of the impact the conduct had in the case and the administration of justice, any mitigating circumstances, and with due consideration given to whether the conduct was an isolated occurrence or a pattern of wrongdoing. *Id.* We find the orders before us as lacking the specificity needed to conduct this level of review. Although the trial court placed great weight on the Annessa Letter, the court indicated the sanctions were imposed as a result of the totality of litigation misconduct. In addition to the Annessa Letter, the orders identified the misconduct to include a failure to cooperate in discovery and an improper job offer. However, the discovery matters were referred to a discovery commissioner. The only discovery commission order we have before us was entered after the discovery hearing and it directs that the parties submit recommended findings and other matters to the discovery commissioner. The lower court's only order with regard to discovery stated that the discovery commissioner "is hereby directed to make written recommendation to this Court as to a resolution of the discovery issues." There is nothing before this Court which indicates any recommendation being submitted by the discovery commissioner to the court, and yet some of the very issues raised and addressed as at least presumably resolved appeared in the sanction orders. Furthermore, our review of the hearing transcript did not indicate that the discovery commissioner would be recommending any finding that Richmond's conduct amounted to bad faith.

**114**

We also find the orders contain broad and sweeping statements regarding misconduct regarding the three identified areas which makes it difficult to determine what specific factual basis exists as support for a given conclusion. This problem with lack of specificity in the orders is only compounded by our pronouncement herein regarding the need for the court's order in light of the record to demonstrate willfulness, bad faith or fault of the offending party for a default judgment sanction to be upheld upon review. Based upon these broader problems with the orders at issue, it would be premature to address the parties' arguments regarding the particular issues raised as to the basis of a sanction, that is, the Annessa Letter, discovery or the offer of employment.

### IV. Conclusion

For the foregoing reasons we grant Petitioners' requested relief to the extent that we vacate the circuit court's November 4 and November 19, 2009, orders regarding and imposing sanctions. The circuit court is authorized to proceed in imposing sanctions if, as established by the terms of the sanction order, the action taken is based on specific factual findings of serious misconduct in light of the standards articulated in syllabus points one and two of *Bartles v. Hinkle* and, to the extent applicable, the new law set forth in this opinion. Therefore, we grant Petitioners a writ of prohibition as moulded.

Writ of prohibition granted.

Chief Justice DAVIS concurs and reserves the right to file a concurring opinion.

DAVIS, Chief Justice, concurring:

The majority opinion has remanded this case to give the trial judge an opportunity to reconsider its sanction ruling under the factors outlined in the opinion. The test adopted by the majority opinion sets out an appropriate standard for trial judges to use when considering the imposition of sanctions on a party under the trial court's inherent authority. Therefore, I concur in the judgment of the majority opinion. I write separately, however, to underscore that the egregious conduct in this case warranted the sanction imposed by the trial judge and thus, no remand is necessitated.

### I. A Defendant Cannot Unilaterally Initiate Contact with a Plaintiff to Settle Part or All of a Claim

In this proceeding, Richmond American attempted to justify its unilateral contact with the plaintiffs by pointing to a comment under Rule 4.2 of the Rules of Professional Conduct.[1] The commentary to Rule 4.2 states that "parties to a matter may communicate directly with each other[.]" This statement does not authorize a party to unilaterally contact an opposing party without first consulting with counsel for the party. In fact, the Indiana Supreme Court has stated Rule 4.2 "is not intended to insulate from scrutiny situations where a party communicates with another ... while the adverse party's counsel is ... unaware of the contact." *In re Anonymous*, 819 N.E.2d 376, 379 n. 1 (Ind.2004). Indeed, this precise issue was addressed by this Court in *Kocher v. Oxford Life Insurance Co.*, 216 W.Va. 56, 602 S.E.2d 499 (2004). In *Kocher*, the defendant unilaterally contacted the plaintiff in an attempt to negotiate a settlement of the case. As a result of such contact, the trial court used its inherent authority to sanction the defendant by imposing a default judgment. After the issue of damages was tried, the defendant appealed. One of the issues raised by the defendant in the petition for appeal was that the trial court committed error in sanctioning the defendant with default judgment for contacting the plaintiff directly and without consulting plaintiff's counsel. This Court reviewed the assignment of error and determined that it had no merit and that the trial court was correct in imposing the sanction. Consequently, this Court accepted the

---

**1.** Rule 4.2 states the following:
In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

It has been correctly stated that "[t]he dual purposes behind Rule 4.2 are to prevent disclosure of attorney/client communications, and to protect a party from 'liability-creating statements' elicited by a skilled interrogator." *State v. Gilliam*, 748 So.2d 622, 638 (La.Ct.App.1999).

petition for appeal on only one issue: whether the trial court erred in giving a jury instruction on the issue of punitive damages.

In a footnote in the *Kocher* opinion, this Court expressed its disapproval of the defendant's action in unilaterally contacting the plaintiff. We said in *Kocher*:

> We observe that the compelling facts of the instant case and applicable law fully support the trial court's ruling imposing sanctions. It should be emphasized that this is not a case of one private litigant innocently seeking to talk directly with another litigant without either party's counsel being present. Rather, this is a case where a sophisticated corporation deliberately lied to a litigant for the purpose of contacting the litigant without his counsel's knowledge, and improperly sought to influence the litigant to settle the case.... [The defendant] acknowledged to the trial judge and the jury at trial that [the defendant's] conduct ... was "wrong." [The defendant] is a sophisticated business entity with substantial experience in the world of litigation. The fact that [plaintiff's] lawyer had specifically advised [the defendant] at a deposition not to discuss settlement with [the plaintiff] is merely cumulative; [defendant's] conduct would have been "wrong" even if [plaintiff's] lawyer had not had the occasion to make such a statement to [the defendant]. [The defendant's] misconduct was a deliberate effort to subvert and circumvent both the attorney-client relationship and the ordinary rules and procedures of litigation. This relationship and these rules and procedures are central to the fair working of our legal system and to the public's confidence in the courts.

*Kocher*, 216 W.Va. at 60 n. 3, 602 S.E.2d at 503 n. 3.

It is clear from the observations made in *Kocher* and the principles set out in the instant case that this Court does not approve of a party unilaterally contacting another party. This position recognizes the highly aggressive nature of civil litigation today, which makes unsophisticated plaintiffs extremely vulnerable to unscrupulously high pressure tactics by corporate defendants.

Support for the position taken in *Kocher* and the principles in the instant case may be found from the fact that a defendant may be sued for initiating direct contact with a plaintiff and settling a claim. There is no question that "[a] [plaintiff] has an absolute right to cancel a retainer agreement, discharge an attorney at any time, and independently settle a case without being liable for breach of contract." *Marks v. Struble*, 347 F.Supp.2d 136, 144 (D.N.J.2004). However, "those who ·encourage or cause a rupture in the attorney-client relationship by means of fraud, coercion, or other wrongdoing are not justified in doing so." *Ferris v. South Florida Stadium Corp.*, 926 So.2d 399, 402 (Fla.Dist.Ct.App. 2006). Stated differently, "while the law does not bind a client to an attorney merely because she has entered into a contingent fee contract, the Court will vigorously protect this contractual relationship when a third party willfully interferes with this relationship by inducing the plaintiff-client to discharge her attorney and settle with the third party." *Jackson v. Travelers Ins. Co. of Hartford, Conn.*, 403 F.Supp. 986, 998–99 (M.D.Tenn.1975). Consequently,

> "When a third person intentionally interferes with [the attorney-client] relationship for his own benefit, either by unlawful means or by lawful means where there is a lack of sufficient justification, by inducing a client to terminate the relationship with his attorney or otherwise act with the intent to deprive the attorney of his remuneration, a cause of action arises in tort for the damages resulting from that act."

*State Farm Mut. Ins. Co. v. St. Joseph's Hosp.*, 107 Ariz. 498, 489 P.2d 837, 841 (1971). Furthermore, "To be actionable the conduct of the [defendant] need not ·necessarily be egregious in nature but only intentional for the improper purpose of inducing the client to repudiate his contract and settle directly with the [defendant]." *Ronald M. Sharrow, Chartered v. State Farm Mut. Auto. Ins. Co.*, 306 Md. 754, 511 A.2d 492, 499 (1986). *See also Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105 (6th Cir.1977) (affirming judgment for attorney in action against defendant that induced attorney's client to settle case); *State Farm Fire Ins. Co. v. Gregory*, 184 F.2d 447, 448 (4th

Cir.1950) (affirming judgment for attorney after finding evidence was sufficient "to support the conclusion that the adjuster obtained the settlement by inducing the insured to abandon his lawyer and save the fee which he had contracted to pay"); *Marks v. Struble*, 347 F.Supp.2d 136, 144 (D.N.J.2004) ("New York courts, even though retainer agreements are terminable at will, recognize an attorney's cause of action against a third party who interferes with the attorney's contingency fee agreement by inducing the client to enter into an independent settlement agreement."); *Ellis Rubin, P.A. v. Alarcon*, 892 So.2d 501 (Fla.Dist.Ct.App. 2004) (holding that attorneys stated a cause of action for tortious interference with a business relationship as a result of defendant's direct contact with their client and subsequent settlement of case with their client); *Knell v. State Farm Mut. Auto. Ins. Co.*, 32 Ill.App.3d 491, 336 N.E.2d 568, 572 (1975) (holding that an attorney has a cause of action against a defendant in an underlying action, when "it was either alleged or shown that the [attorney's] client was induced by or conspired with the defendant to breach or terminate his contract with an attorney."). Moreover, plaintiff's counsel may obtain punitive damages against a defendant for wrongfully contacting his/her client to settle the underlying claim. *See Cross v. American Country Ins. Co.*, 875 F.2d 625, 632 (7th Cir.1989) ("On the facts of this case, we believe that punitive damages were properly awarded. From the evidence that defendant told Patterson to come to its office to settle without his lawyer, told him that he did not need a lawyer and that litigation takes a long time, the jury was entitled to conclude that the company intentionally induced Patterson to breach his contract and that its conduct was of a willful, wanton, and malicious nature.").

To the extent that a defendant seeks to have direct contact with a plaintiff, I suggest the following procedure be utilized so one does not violate Rule 4.2. Prior to a defendant having direct contact with a plaintiff, the plaintiff's counsel must be informed by

defense counsel that such contact is desired. It is the duty of plaintiff's counsel to inform his/her client that the defendant wishes to have direct contact with the plaintiff, either in person or through written or other form of communication. If the plaintiff consents to such direct contact, plaintiff's counsel has a duty to inform the defendant's counsel that defendant can have direct contact with the plaintiff only under the circumstances approved of by the plaintiff.[2] *See Bowens v. Atlantic Maint. Corp.*, 546 F.Supp.2d 55, 90 (E.D.N.Y.2008) (granting a protective order to prevent defendant from directly contacting plaintiffs); *Murton v. Measurecomp, LLC*, No. 1:07CV3127, 2008 WL 5725628, at *6 (N.D.Ohio, Dec. 2, 2008) (requiring defendant to submit any offer of judgment to plaintiffs' counsel and not to plaintiffs).

## II. Richmond American's Conduct Undermines the Integrity of the Judicial Process

The record in this case clearly establishes that Richmond American implemented two tactical decisions to undermine the plaintiffs' attorney-client relationship. This Court has definitively stated that "[a]n attorney's nondelegable duty of loyalty to his client and the level of trust a client places in his attorney are ... essential elements of the attorney-client relationship." *Delaware CWC Liquidation Corp. v. Martin*, 213 W.Va. 617, 622, 584 S.E.2d 473, 478 (2003). In addition, '[t]he attorney/client relationship is one that is highly valued by society and protected in the law. The relationship between lawyer and client is as sensitive a relationship as can exist and demands absolute confidence on the part of the client in order to thrive.' *Nesselrotte v. Allegheny Energy, Inc.*, 615 F.Supp.2d 397, 405 n. 14 (W.D.Pa.2009) (quoting *Klages v. Sperry Corp.*, No. 83–3295, 1984 WL 49135 (E.D.Pa. Nov.9, 1984)). Further, " '[a]s long as our society recognizes that advice as to matters relating to the law should be given by persons trained in the law—that is, by lawyers—anything that materially interferes with that relationship must be restricted or eliminated[.]' " *State ex rel.*

---

**2.** This procedure would be the same for a plaintiff who seeks to initiate direct contact with the

defendant.

*Peabody Coal Co. v. Clark,* 863 S.W.2d 604, 607 (Mo.1993) (quoting *State ex rel. Great Am. Ins. Co. v. Smith,* 574 S.W.2d 379, 383 (Mo.1978)). Finally, it has been said that

> [t]he client-lawyer relationship is structured to function within an adversarial legal system. In order to operate within this system, the relationship must do more than bind together a client and a lawyer. It must also work to repel attacks from legal adversaries. Those who are not privy to the relationship are often purposefully excluded because they are pursuing interests adverse to the client's interests.

*MNC Credit Corp. v. Sickels,* 255 Va. 314, 497 S.E.2d 331, 334 (1998) (internal quotations and citation omitted).

In the instant case, Richmond American attempted to thwart the plaintiffs' attorney-client relationship by offering their counsel a job. This egregious conduct by Richmond American was a blatant attempt to undermine "the attorney-client relationship and imperil the sanctity of the highly confidential and fiduciary relationship existing between attorney and client." *Learning Curve Int'l, Inc. v. Seyfarth Shaw, LLP,* 392 Ill.App.3d 1068, 331 Ill.Dec. 843, 911 N.E.2d 1073, 1080 (2009). In my judgment, this conduct alone was invidious enough to warrant imposition of default judgment against Richmond American. The integrity of the attorney-client relationship cannot tolerate attempts by defendants to "buy-off" opposing counsel to facilitate an unfair settlement of claims against them.

When Richmond American failed in its attempt to "buy-off" plaintiffs' counsel, it made a tactical decision to drive a wedge between the plaintiffs and their counsel. It did this initially by having defense counsel ask plaintiffs' counsel to allow defense counsel to have direct contact with the plaintiffs. When this effort failed, Richmond American took the deliberate and calculated step of going directly to the plaintiffs with a malicious letter that was designed to interfere with, and sabotage, the attorney-client relationship between the plaintiffs and their counsel.[3] The trial court's order specifically found that the intent of the letter sent by Richmond American was "to sow discord and distrust between counsel for the Plaintiffs and the Plaintiffs themselves[.]" The letter stated in part: "It is my understanding that your attorney chose not to send this letter to you; therefore I am making the offer directly to you." This statement accuses plaintiffs' counsel of deliberately failing to inform the plaintiffs of a purported partial settlement offer. This accusation implicitly suggests to the plaintiffs that they cannot trust their attorney, and that their attorney has elevated his interests above their interests.

In addition to attacking the integrity of plaintiffs' counsel, the letter also sought to intimidate the plaintiffs into accepting Richmond American's offer of partial settlement. The letter did this by stating the following: "This offer is intended to be admissible in court should this lawsuit progress." It is quite obvious that this statement was designed to place pressure on the plaintiffs to accept the partial settlement, or run the risk of having a jury be informed that they refused the offer. In making this groundless threat, Richmond American knew, but the plaintiffs did not, that "[t]he well established and widely recognized general rule is that an unaccepted offer to compromise a disputed claim is not admissible as evidence[.]" *Shaeffer v. Burton,* 151 W.Va. 761, 770, 155 S.E.2d 884, 891 (1967). *Accord Lively v. Rufus,* 207 W.Va. 436, 449, 533 S.E.2d 662, 675 (2000) ("[W]e find that the circuit court did not err by excluding the 'Settlement and Indemnification Agreement.'"); *Schartiger v. Land Use Corp.,* 187 W.Va. 612, 617, 420 S.E.2d 883, 888 (1991) ("The trial court properly excluded the evidence of an offer of settlement under Rule 408, W. Va. R. Evidence."). *See also Brynwood Co. v. Schweisberger,* 393 Ill.App.3d 339, 332 Ill.Dec. 555, 913 N.E.2d 150, 160 (2009) ("It is well settled that offers of settlement and compromise are not admissible into evidence."); *McMullen v. Kutz,* 603 Pa. 602, 985 A.2d 769, 774 (2009) ("[A]n offer to compromise a claim, not ac-

---

**3.** As pointed out in the majority opinion, the letter purportedly offered to install a radon re-

duction system in the plaintiffs' homes.

cepted, cannot be introduced into evidence[.]"). In the final analysis, to condone the conduct of Richmond American "would deprecate and lessen the sanctity of the attorney-client [relationship]." *United States v. Edwards*, 39 F.Supp.2d 716, 746 (M.D.La. 1999). Consequently, I believe the trial court was correct by imposing the sanction of default judgment. I also believe the record will support such a sanction on remand under the test outlined in the majority opinion.