# STATE OF WEST VIRGINIA
# SUPREME COURT OF APPEALS

**Crystal Mountain West Virginia, LLC
and Steven Minard,
Plaintiffs Below, Petitioners**

**FILED**
**June 18, 2020**
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

**vs.)  No. 19-0482** (Ohio County 16-C-213)

**The County Commission of
Ohio County, West Virginia,
The Ohio County Development Authority,
West Virginia Economic Development Authority,
Randy Wharton, and Gregory L. Stewart,
Defendants Below, Respondents**

## MEMORANDUM DECISION

Petitioners Crystal Mountain West Virginia, LLC ("Crystal Mountain"), and Steven Minard, by counsel Avrum Levicoff, appeal the Circuit Court of Ohio County's April 29, 2019, order dismissing their civil action as a sanction for producing fraudulent bank records to support their claim of more than $21 million in damages. Respondents the County Commission of Ohio County, West Virginia, by counsel David L. Wyant and Diane G. Senakievich; the Ohio County Development Authority, by counsel Philip J. Sbrolla and Jordan A. Swaton; Randy Warton and Gregory L. Stewart, by counsel Robert P. Fitzsimmons and Robert J. Fitzsimmons; and the County Commission of Ohio County, West Virginia, and the Ohio County Development Authority, represented by Donald J. Tennant Jr. on their counterclaim, filed a response. Petitioners filed a reply.

This Court has considered the parties' briefs and the record on appeal. The facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Upon consideration of the standard of review, the briefs, and the record presented, the Court finds no substantial question of law and no prejudicial error. For these reasons, a memorandum decision affirming the circuit court's order is appropriate under Rule 21 of the Rules of Appellate Procedure.

On July 8, 2016, petitioners filed a complaint against respondents, the essence of which was that respondents breached the agreement that the parties entered into for the development of a theme park in Wheeling, West Virginia, to be called "Wild Escape." Petitioners' claimed expenditures in furtherance of the park development totaled more than $21 million. Throughout

1

most of the litigation, this amount was supported by only an "Attraction Management Services Run Report" ("AMS Run Report"),[1] which was simply a spreadsheet documenting expenditures purportedly made between 2006 and 2010 related to park development. When asked for proof of these claimed expenditures, Petitioner Minard testified in his deposition that Crystal Mountain, the entity responsible for the park's development, destroyed its financial records in accordance with its three-year document retention policy, but he identified Liberty Bank as the institution that would have processed the payments.

In May of 2018, following Petitioner Minard's deposition, petitioners' then-counsel[2] e-mailed respondents' counsel to advise that he was "sending out [responsive] discovery today containing Liberty Bank records that I received yesterday" from Petitioner Minard. Counsel explained that Petitioner Minard discovered the records—dated from March 31, 2006, to November 30, 2010,[3] for account holder "Crystal Mountain WV LLC DBA Wild Escape"—in "a box of household items marked 'VHS'" while looking for documents at a storage facility in Alta, Iowa. Counsel stated that he had "reconciled every debit and credit in the bank statements into one spreadsheet and every invoice by category in the AMS Run Report into a second spreadsheet," finding that the transactions listed in the AMS Run Report "correlate[d] perfectly" with those documented in the bank records. Counsel noted that there existed an "issue," however, with Liberty Bank in that it was purchased by Central Bank and Northwest Bank, entities from which petitioner had previously requested records to no avail. But "[a]rmed with my new information," including an account number and the entity name exactly as it appeared on the account, petitioners' counsel continued, he was "sending out multiple new financial releases and requests for records today" in the hopes of obtaining "any financial documents but primarily cancelled checks because those were not in the VHS box yesterday." As stated would be done in the e-mail, petitioners formally produced the Liberty Bank records in response to a discovery request from Respondent The County Commission of Ohio County.

After this production, respondents deposed Donna Allen, the records custodian and former fraud investigator for Liberty Bank.[4] Ms. Allen testified that she had never seen records

---

[1] Attraction Management Services ("AMS") is an entity related to Crystal Mountain. According to Petitioner Minard, Crystal Mountain's principal and co-owner, AMS possessed billing processing software that Crystal Mountain used to produce its invoices.

[2] During this litigation, petitioners have had multiple attorneys represent them for a time, only to then withdraw from that representation. Following production of the bank records at issue here, petitioners' counsel withdrew from representation citing a breakdown of the attorney-client relationship. Petitioners then retained their current counsel.

[3] Curiously, these bank records covered a period of time for which records should not have existed, given petitioners' policy of retaining records for only three years.

[4] Although Liberty Bank was no longer in operation, Ms. Allen, whose employment carried over to the successor bank, testified that "[w]e have all records that would have pertained

(continued . . . )

2

like those produced by petitioners. Compared against known authentic Liberty Bank records, Ms. Allen identified a number of discrepancies in the records produced by petitioners. Some notable differences included an account number two digits shorter than Liberty Bank's standard account numbers and an incorrect numerical bank identifier. Ms. Allen searched a database that included all Liberty Bank account numbers. The account number on the records produced by petitioners was not in that database. Similarly, a search of the database for a particular daily closing balance reflected on one of the records produced revealed no account with an ending balance that matched the one on the record. In short, Ms. Allen testified, if an account at Liberty Bank had the identified balance on the identified date, she would have located it, but Ms. Allen concluded that there was no such account. Ultimately, Ms. Allen was unable to find any record of an account held by Crystal Mountain, AMS, Petitioner Minard, or any of Petitioner Minard's relatives.

In August of 2018, respondents moved, pursuant to Rules 16 and 37 of the West Virginia Rules of Civil Procedure, for the sanction of dismissal of petitioners' complaint for "unconscionable discovery violations." Respondents characterized the purported Liberty Bank records as fraudulent and argued that the sanction of dismissal was warranted for petitioners' "attack on the truth finding process."[5]

Petitioners opposed the motion, arguing that dismissal was not an appropriate sanction. Petitioners also requested a hearing. Later, petitioners sought leave to submit evidence to support their opposition to respondents' motion for sanctions. In their motion, petitioners stated that the court had not indicated "whether a hearing would be held, nor whether [petitioners] were permitted to submit any testimonial evidence"; accordingly, they sought leave to submit the "Declaration of Steven Minard," in which he claimed that he found the disputed records in a storage facility in Alta, Iowa, and that he "did not fraudulently create these records, and I cannot imagine that anyone else did either."

On April 29, 2019, invoking Rule 37(b)(2)(C) of the West Virginia Rules of Civil Procedure and its inherent powers, the circuit court granted respondents' motion for sanctions. The court detailed that petitioners' counsel e-mailed respondents' counsel

> indicating that bank records from Liberty Bank—the bank records [Petitioner] Minard claimed corroborated a substantial part of [petitioners'] damage claim— were inexplicably found and produced by [Petitioner] Minard. . . . It was further

---

to Liberty Bank," including those generated from 2006 through 2010—the period covered by the records petitioners produced.

[5] Respondents also made several arguments related to the merits of petitioners' asserted causes of action, and they alleged misconduct aside from the production of the bogus bank records. Because the circuit court did not make findings related to the merits of petitioners' claims or cite any of the other alleged misconduct as a basis for its action, those arguments are not recounted here.

represented that every invoice in the [petitioners' AMS Run Report] was corroborated by those documents.

The court recounted Ms. Allen's deposition testimony, noting that she identified "at least eleven specific abnormalities in the purported banking statements . . . that were inconsistent with actual banking statements generated by Liberty Bank." The court characterized Ms. Allen's testimony as dispositive of the question of whether the disputed records were fraudulent. Although the court recognized that Petitioner Minard denied creating the disputed records, it attached little weight to that assertion, stating that

> [Petitioner] Minard is responsible for knowing that Crystal Mountain, West Virginia, LLC did not possess a bank account with more than $20 million in assets. He is responsible for knowing that the new 'Minard's Liberty Bank Records' were false when they were produced. He cannot deny that these documents are fraudulent because there is no basis to support such a denial.

Concluding that "[Petitioner] Minard was the person who had to provide his counsel with the alleged false factual representations that permitted his attorneys to engage in a shocking pattern of grossly negligent, if not fraudulent, conduct that obstructed the handling of this case and the administration of justice," that there were "no mitigating circumstances" given petitioners' creation of "a pattern of wrongdoing throughout the case," and that Petitioner Minard had "contributed to his counsel's continuing serious wrongful conduct in this case," the court dismissed petitioners' complaint. This appeal followed.

On appeal, petitioners raise five assignments of error.[6] Two of the assignments of error challenge the court's discretion to employ dismissal as a sanction under Rule 37 of the West Virginia Rules of Civil Procedure. In these, petitioners claim that the court was required to hold a hearing prior to dismissing their complaint[7] and that the necessary predicates for imposition of a

---

[6] Technically, petitioners assert six assignments of error but brief only five, as two assignments of error are addressed together; accordingly, we have also combined those assignments of error. We have also taken petitioners' assignments of error out of order to group like claims together for efficient organization and disposition.

[7] In support of petitioners' argument that the court was required to hold a hearing, they cite syllabus point 2 of *Bell v. Inland Mutual Insurance Co.*, 175 W. Va. 165, 332 S.E.2d 127 (1985), holding that

> [t]he striking of pleadings and the rendering of judgment by default against a party as sanctions under *W.Va.R.Civ.P.* 37(b) for that party's failure to obey an order of a circuit court to provide or permit discovery may be imposed by the court where it has been established through an evidentiary hearing and in light of the full record before the court that the failure to comply has been due to willfulness, bad faith or fault of the disobedient party and not the inability to comply and, further, that such sanctions are otherwise just.

sanction under this Rule did not exist. Namely, there was no order providing or permitting discovery and, consequently, no violation of that order. Petitioners also raise two assignments of error that challenge the dismissal under the court's inherent powers. The alleged errors include that the court's findings were insufficient to support dismissal and that petitioners were denied due process. In their last assignment of error, petitioners claim that the court failed to specify whether it was entering a criminal or civil sanction. The first step to addressing petitioners' arguments, however, is to review the authority underpinning the circuit court's action because, "before issuing a sanction, a court must ensure it has an adequate foundation either pursuant to the rules or by virtue of its inherent powers to exercise its authority." *State ex rel. Richmond Am. Homes of West Virginia, Inc. v. Sanders*, 226 W. Va. 103, 110, 697 S.E.2d 139, 146 (2010) (citing syl. pt. 1, in part, *Bartles v. Hinkle*, 196 W. Va. 381, 472 S.E.2d 827 (1996)).

Concerning sanctions imposed under Rule 37(b)(2)(C)[8] of the West Virginia Rules of Civil Procedure, we made clear in *Sanders* that the

> striking of pleadings and rendering a default judgment for a discovery violation pursuant to Rule 37(b) of the Rules of Civil Procedure will only be upheld if willfulness, bad faith or fault of the party disobeying the *order to compel* is established through an evidentiary hearing and in light of the full record before the trial court.

---

[8] This Rule provides, in relevant part,

(b) *Failure to comply with order*.

. . . .

(2) Sanctions by court in which action is pending. – If a party or an officer, director, or managing agent of a party or a person designated under Rules 30(b)(6) or 31(a) to testify on behalf of a party fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this rule or Rule 35, or if a party fails to supplement as provided for under Rule 26(e), or if a party fails to obey an order entered under Rule 26(f), the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following:

. . . .

(C) An order striking out pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default against the disobedient party . . . .

W. Va. R. Civ. P. 37(b)(2)(C).

226 W. Va. at 110, 697 S.E.2d at 146. Here, just as in *Sanders*, "[t]hose prerequisites [cannot] be satisfied . . . as there existed no order compelling discovery on which willfulness, bad faith or fault could be established." *Id.* Accordingly, the circuit court's sanction cannot be properly upheld under Rule 37 of the West Virginia Rules of Civil Procedure.

But, with respect to the other foundation for the circuit court's action, we have held that "[a] court 'has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction.'" *Sanders*, 226 W. Va. at 105, 697 S.E.2d at 141, syl. pt. 3 (citation omitted). "The inherent power of courts to sanction misconduct includes the authority to enter default judgment orders in appropriate circumstances," *id.*, syl. pt. 4, and the United States Supreme Court has "recognized that even though the sanction of dismissal is 'particularly severe . . . [it] is within the court's discretion.'" *Id.* at 111, 697 S.E.2d at 147 (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991)). Having determined that the circuit court is inherently empowered to sanction misconduct through dismissal, we examine petitioners' assignments of error and the unique circumstances before us utilizing the following standard of review:

> Imposition of sanctions of dismissal and default judgment for serious litigation misconduct pursuant to the inherent powers of the court to regulate its proceedings will be upheld upon review as a proper exercise of discretion when trial court findings adequately demonstrate and establish willfulness, bad faith or fault of the offending party.

*Id.* at 106, 697 S.E.2d at 142, syl. pt. 7.[9]

In petitioners' assignment of error claiming that the circuit court's findings were inadequate to support dismissal under its inherent powers, petitioners characterize the court's order as "broad and sweeping," and they are critical of what they describe as a lack of evidence "regarding the circumstances surrounding the creation of" the bank records. They argue that there was no evidence that petitioners or anyone associated with them created the bank documents, which they claim, relatedly, cannot correctly be characterized as "fraudulent." Instead, the documents "may well be inauthentic, and perhaps not genuine." Also, petitioners take issue with the lack of finding that they or their counsel "made any fraudulent use of the documents." Petitioners paint a benign picture of their actions: "[T]hese documents were simply

---

[9] As a result of this finding, we need not address petitioners' assignments of error related to Rule 37. The law pertaining to the procedures necessary for the imposition of sanctions under Rule 37 does not guide our review, and any deviation from those procedures does not afford petitioners relief. We also note that the court's citation to Rule 37 in addition to its inherent powers as a source of authority is not fatal to the court's order. "This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syl. Pt. 3, *Barnett v. Wolfolk*, 149 W. Va. 246, 140 S.E.2d 466 (1965).

provided by [Petitioner] Minard to his counsel, and produced to opposing counsel under an e[-]mail containing no representation as to their authenticity or genuineness, and clearly explaining that they were found '[i]nside the box . . . . '"[10] With further regard to the adequacy of the circuit court's findings, petitioners state that, despite the court's attribution of a "false representation" to petitioners or their counsel, "there is no description in the [circuit court's order] of what those alleged false representations may have been."

In their second assignment of error challenging the court's dismissal under its inherent powers, claiming a denial of due process, petitioners cite *Bartles*, 196 W. Va. at 384, 472 S.E.2d at 830, syl. pt. 1, in part, and state that "[t]he Due Process Clause of Section 10 of Article III of the West Virginia Constitution requires that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case." Petitioners submit that a more appropriate sanction would have been an order in limine prohibiting their use of the bank records, and they argue that a hearing before the circuit court was necessary.

The process for reviewing a court's sanction imposed by virtue of its inherent powers is set forth in syllabus points 5 and 6 of *Sanders*:[11]

> Although Rules 11, 16, and 37 of the West Virginia Rules of Civil Procedure do not formally require any particular procedure, before issuing a sanction, a court must ensure it has an adequate foundation either pursuant to the rules or by virtue of its inherent powers to exercise its authority. The Due Process Clause of Section 10 of Article III of the West Virginia Constitution requires that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case. Thus, a court must ensure any sanction imposed is fashioned to address the identified harm caused by the party's misconduct.

---

[10] Petitioners also reduce their actions below to the following:

[T]he only acts committed by the [petitioners] and their counsel consist of [Petitioner] Minard having happenstantially [sic] discovered these documents in a box in a storage area, and upon realizing that they were within the scope of what had been requested in discovery, he provided those documents to his counsel.

Petitioners then ponder, "Even assuming that the documents are not genuine, it is very difficult upon reflection to understand what the [petitioners], or their counsel, should have done differently."

[11] These holdings were articulated initially in examining sanctions imposed for discovery violations; however, we stated in *Sanders* that "[t]he same general process regarding imposition of sanctions applies whether a trial court is proceeding under the authority of rule, statute or its inherent authority." 226 W. Va. at 112, 697 S.E.2d at 148.

226 W. Va. at 105, 697 S.E.2d at 141, syl. pt. 5 (citing *Bartles*, 196 W. Va. at 384, 472 S.E.2d at 830, syl. pt. 1). And,

> [i]n formulating the appropriate sanction, a court shall be guided by equitable principles. Initially, the court must identify the alleged wrongful conduct and determine if it warrants a sanction. The court must explain its reasons clearly on the record if it decides a sanction is appropriate. To determine what will constitute an appropriate sanction, the court may consider the seriousness of the conduct, the impact the conduct had in the case and in the administration of justice, any mitigating circumstances, and whether the conduct was an isolated occurrence or was a pattern of wrongdoing throughout the case.

*Id.* at 106, 697 S.E.2d at 142, syl. pt. 6 (citing *Bartles*, 196 W. Va. at 384, 472 S.E.2d at 830, syl. pt. 2). In sum,

> our review actually involves a two-step process of first examining whether the sanctioning court identified the wrongful conduct with clear explanation on the record of why it decided that a sanction was appropriate. . . . We then must determine whether the sanction actually imposed fits the seriousness of the identified conduct in light of the impact the conduct had in the case and the administration of justice, any mitigating circumstances, and with due consideration given to whether the conduct was an isolated occurrence or a pattern of wrongdoing.

*Id.* at 113, 697 S.E.2d at 149 (citations omitted).

Under these standards, the circuit court's findings were adequately specific, and petitioners' conduct was sufficiently egregious to warrant the sanction of dismissal. Looking first at "whether the sanctioning court identified the wrongful conduct with clear explanation on the record of why it decided that a sanction was appropriate," *id.* (citation omitted), we find that the court identified the misconduct as petitioners' production of fabricated bank records. It supported its conclusion on the authenticity of the records by reference to Ms. Allen's deposition testimony, which made "clear that there were at least eleven specific abnormalities in the purported banking statements, produced by [petitioners] and testified about by [Petitioner] Minard, that were inconsistent with actual banking statements generated by Liberty Bank." Though Petitioner Minard denied creating the falsified documents, the court nonetheless reasonably found Mr. Minard solely accountable based on the unrefuted evidence that Mr. Minard was responsible for knowing that Crystal Mountain did not possess a bank account holding over $20 million and that the bank records were false when he produced them.

In finding that a sanction was necessary, the court took account of the length of time that the matter had been pending and respondents' persistence in seeking proof of petitioners' claimed damages. The court noted that "[a]fter years of discovery and hundreds of pages of documents," the only supposed proof of petitioners' claimed damages was the AMS Run Report. Respondents sought substantiating documents "[f]or over a [two-]year period" before petitioners produced the fabricated records. Petitioners' knowingly dishonest production forced respondents

8

to depose Ms. Allen to fully expose petitioners' misrepresentations. Despite Ms. Allen's damning testimony, Petitioner Minard submitted a declaration in which he denied creating the falsified documents and stated that he could not "imagine that anyone else [created the documents] either."[12] The court found that respondents had "suffered enough," and it was not inclined to allow petitioners "to try to raise . . . new issues and try to conduct further discovery with nothing more than the hope of finding something that will benefit [petitioners]" given Petitioner Minard's "incredible fabrication that [he] spun for a number of years at a substantial cost and inconvenience to [respondents]." Thus, the court's findings sufficiently "identif[y] the wrongful conduct with clear explanation on the record of why it decided that a sanction was appropriate." *Id.* (citation omitted).

Contrary to petitioners' assertions, this is not a case where the circuit court's order "lack[s] the specificity needed to conduct this level of review," as was the case in *Sanders*. *Id.* at 113, 697 S.E.2d at 149. Nor do we find the statements of misconduct to be "broad and sweeping" such that it is "difficult to determine what specific factual basis exists as support for a given conclusion." *Id.* at 114, 697 S.E.2d at 150. The court's order clearly and specifically identifies petitioners' misconduct and the bases for the court's conclusions; furthermore, the court's findings amply demonstrate that the misconduct necessitated sanctioning.

Turning to the second step of the review, we find that the sanction of dismissal fits the seriousness of petitioners' misconduct. In considering the impact that production of the falsified records had on the administration of justice, the court detailed the time expended and resources diverted to uncovering the fraudulent nature of the documents. After Petitioner Minard turned the falsified records over to his attorney, petitioners' counsel undertook a review of the records and reconciled them against the claimed expenditures on the AMS Run Report. Lending some amount of credibility (albeit perhaps unknowingly) to the documents, counsel remarked that the transactions on the AMS Run Report and documented in the bank records "correlate[d] perfectly." As found by the circuit court, Petitioner Minard's production of the falsified records "permitted his attorneys to engage in a shocking pattern of grossly negligent, if not fraudulent, conduct that obstructed the handling of this case and the administration of justice." Further, the conduct necessitated taking Ms. Allen's deposition, and despite her testimony, Petitioner Minard asserted that he did not create the records or believe that anyone would have. This "continuing conduct of the [petitioners]," the court found, amounted to a "pattern of wrongdoing," and because it found "absolutely no mitigating circumstances," there were none for the court to consider. Under these circumstances, the court concluded that it was "mandated to impose the ultimate sanction." As the court's order contains findings that "adequately demonstrate and establish willfulness, bad faith or fault" on petitioners' part, *id.* at 113, 697 S.E.2d at 149, we find no merit to petitioners' argument that the court's order was insufficiently detailed to warrant the sanction of dismissal.

---

[12] Indeed, no one else has been identified as having had the incentive or occasion to create these documents.

We likewise find no merit to petitioners' contention that they were denied due process. As stated above, the Due Process Clause "requires that there exist a relationship between the sanctioned party's misconduct and the matters in controversy such that the transgression threatens to interfere with the rightful decision of the case." *Sanders*, 226 W. Va. at 105, 697 S.E.2d at 141, syl. pt. 5, in part (citation omitted). Though petitioners suggest that an order precluding their use of the forged documents at trial would sufficiently remedy the misconduct, we find no error in the court's conclusion that the knowing production of counterfeit bank records threatened to interfere with the rightful decision of this case such that dismissal was warranted. The matters in controversy largely concerned—indeed, the viability of certain of petitioners' claims turned on—petitioners' claimed expenditures in furtherance of the park's development, and the counterfeit records were the only corroboration of their claimed damages. Due process concerns are plainly not implicated here in light of the strong relationship between petitioners' misconduct and the matters in controversy.[13]

In their final assignment of error, petitioners argue that the circuit court failed to comply with certain requirements set forth in *Vincent v. Preiser*, 175 W. Va. 797, 338 S.E.2d 398 (1985). Generally, petitioners claim that the court failed to "make clear in the sanction order whether the sanction being imposed is intended as a criminal or civil sanction, and then must impose a sanction that is consistent with that intent." Petitioners maintain that dismissal was a criminal penalty and, as a result, the court was required to "make the wholly criminal nature of this sanction plain" in its order.

Petitioners' reliance on *Vincent* is misplaced. In *Vincent* we addressed an order imposing monetary sanctions for contempt of court due to a party's failure to comply with discovery orders. *Id.* at 798, 338 S.E.2d at 399. We found that the circuit court's sanctions—imposed simultaneously as punishment "for an affront to the dignity or authority of the court" and to "compel compliance with a court order"—impermissibly confused or combined purposes in treating the failure to comply with discovery orders as partially criminal contempt and partially civil contempt. *Id.* at 803, 338 S.E.2d at 404. In this case, there was no contempt order, nor was there a discovery order with which petitioners failed to comply. Thus, our pronouncements relative to criminal and civil contempt and the sanctions available for each type of contempt afford petitioners no relief.

For the foregoing reasons, we affirm.

Affirmed.

---

[13] With respect to petitioners' contention that a hearing should have been held, we observe that nothing in *Bartles* or *Sanders* requires a hearing and that the issue was fully developed before the circuit court. Petitioners claim that, "[h]ad the court conducted a hearing, at least the facts hereinafter set forth would have been shown." What followed, however, was simply a recitation of the procedural posture of the case and reference to Petitioner Minard's declaration. Thus, the facts petitioners would have presented at a hearing were already known to and considered by the court.

**ISSUED:** June 18, 2020

**CONCURRED IN BY:**

Chief Justice Tim Armstead
Justice Margaret L. Workman
Justice Elizabeth D. Walker
Justice Evan H. Jenkins
Justice John A. Hutchison